(No. 19944.—

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator,
*vs.* NEWTON R. GILMORE, Respondent.

*Opinion filed June 18, 1931—Rehearing denied October 7, 1931.*

John L. Fogle, for relator.

Walter A. Murray, for respondent.

Mr. Chief Justice Stone delivered the opinion of the court:

This is an information to disbar the respondent. The charges against him arise out of a certain suit brought and prosecuted by him against the city of Chicago to recover damages caused by a fire occurring on September 15, 1922, in a one-story garage on the rear of premises known as 2011 and 2013 West Division street, Chicago. On the front of these premises, connected with the garage, were two small store rooms and over one of them an apartment. A brick wall separated them from the garage. The premises were owned by Charles A. Sampson and Dora Sampson, his wife, in joint tenancy. Sampson died before the happening of the events out of which the charges of the information arise. The premises were covered by $11,000 insurance. The policies were issued by seven different companies. The insurance companies adjusted the loss at the sum of $4241.94, which was paid.

The information charges that the respondent solicited the insurance companies to employ him to collect from the city the amounts paid under their policies on the ground that the fire was caused by the negligence of one of the city's employees. The information also charges that during February, 1927, respondent called on Dora Sampson, the then owner of the premises, introduced himself as attorney for the insurance companies, told her that an investigation showed that a city employee caused the fire, and that the insurance companies desired to bring an action against the city in her name in order to recover what they had paid;

that it was necessary for her to consent in writing to such proceeding; that the suit must be brought in her name but that it would be at the expense of the insurance companies and she would be in no way obligated, and that she told him she had no objection provided she would be put to no expense. It is charged that thereafter respondent submitted to Dora Sampson subrogation agreements with each of the seven insurance companies for the amounts paid by them, giving to them the right to prosecute the suit in her name for the recovery of those amounts; that the agreements were thereafter executed by Dora Sampson and the suit in her name against the city of Chicago was begun in the superior court, and that thereafter, while the suit was pending, respondent prepared and submitted to Dora Sampson a contract assigning the cause of action to him. The consideration named in the assignment was one dollar and the further consideration that she be not required to appear and testify. This assignment carried with it a power of attorney to receipt for any judgment recovered and to collect the proceeds thereof, to endorse her name on any check or voucher issued and retain the proceeds, aside from expenses of the litigation and the claims of the insurance companies. The information charges that at the time of the presentation of this assignment respondent represented to Dora Sampson that the recovery could not be substantially more than the amount the insurance companies had paid, but that for his protection and to protect advances made by him he desired the assignment and would make a small payment therefor. It is also alleged that Dora Sampson submitted the assignment to her attorney, and was advised by him that inasmuch as recovery could not be for more than the amount of damages paid by the insurance companies it would be proper for her to sign same, provided it protected her from any expense, costs, charges or damages arising out of the case; that her attorney then wrote in a clause requiring respondent to protect Dora Sampson from all expense, costs

or damages, and she thereupon executed the assignment on March 21, 1928, and delivered it to respondent, and that thereafter respondent paid to said Dora Sampson the sum of $10. It is also charged that the records of the superior court of Cook county show that the suit, which was filed in the name of Dora Sampson against the city of Chicago on April 22, 1927, was on a declaration filed the same day alleging damages in the amount of $20,000; that thereafter the city filed a plea of not guilty, and that on March 6, 1928, the *ad damnum* was increased to $25,000. It is further charged that on April 26, 1928, a stipulation was filed in the cause, signed by respondent as attorney for the plaintiff and by a representative of the corporation counsel's office representing the city, admitting that the city was liable for the damages resulting from the fire, and that on April 26, 1928, a verdict was rendered for the sum of $23,500 and on that date a judgment was entered on the verdict for that amount. The information then charges that a short time after the entry of the judgment, and contrary to the usual custom of the city, respondent was given a voucher of the city for the sum of $23,500 and collected the same; that respondent thereafter paid to the several insurance companies fifty per cent of the amount paid by them on the insurance policies and converted the entire balance to his use; that he made no report of the result to Dora Sampson, and that she learned of the entry of the judgment through other sources and made a demand upon respondent for an accounting, which he refused to give and refused to pay her any part of the money so recovered. The charge is that respondent, by reason of the foregoing, overreached and defrauded said Dora Sampson and willfully and knowingly defrauded the city of Chicago by procuring a judgment grossly in excess of the actual amount of loss sustained. The respondent filed an answer denying that he overreached and defrauded Dora Sampson or that he defrauded the city of Chicago and set out his version of the transaction,

which will be hereinafter referred to· in consideration of the evidence.

The commissioner to whom the cause was referred conducted hearings on the matter from time to time, and a large amount of evidence, covering over 600 pages of the transcript, was introduced. He found that while respondent claimed he·was representing the insurance companies as subrogees, under the contracts of insurance with Charles A. and Dora Sampson, suit was not brought under the provisions of section 18 of the Practice act either in the name of the subrogees or for their use, and that a judgment was rendered and satisfied on the suit filed in the sum of $23,500, notwithstanding the fire loss had been satisfactorily adjusted and settled by Charles A. and Dora Sampson by the payment by the insurance companies of $4241.94. The commissioner further finds that the record shows that the respondent acted as attorney for Dora Sampson and used her name as plaintiff in the case against the city; that on March 21, 1928, while the action was pending and undetermined, he purchased of Dora Sampson for one dollar, and upon condition that she would not be required to appear in court and testify, all her right, title and interest in and to the right of action against the city of Chicago, and that such practice is contrary to the canons of professional ethics adopted by the Chicago Bar Association, the Illinois State Bar Association and the American Bar Association, the tenth canon of which reads: "The lawyer should not purchase any interest in the subject matter of the litigation which he is conducting." He also found that the practices indulged by respondent in the case against the city may be calculated to bring courts of justice into disrepute and contempt and to tarnish the good name and fame of the legal profession, yet in view of all the circumstances recommends that respondent be severely reprimanded for his conduct and that he be denied the right to practice law in the State

of Illinois for such time as to the court may seem proper under all the circumstances.

Both the relator and the respondent filed objections to the report of the commissioner, which are urged here. The grounds of the relator's objections are, that the commissioner should have found that the respondent overreached and defrauded Dora Sampson and willfully and knowingly defrauded the city of Chicago by procuring a judgment grossly in excess of the loss sustained by reason of the fire to the premises involved, and also that the commissioner should have recommended that the rule be made absolute.

Respondent filed numerous objections to the findings of the commissioner, which are urged here in his assignments and will be considered in this opinion.

It appears from the evidence in the record that one Bedtke was a tenant in the living apartment and in the garage in which the said fire occurred; that respondent conducted for him a suit against the city and established the liability of the city for the damage by reason of the negligence of a street cleaner who burned the rubbish in the alley so close to the garage that the fire caught in it; that thereafter respondent was employed by the seven insurance companies—whether on his solicitation or theirs is not clear—to bring subrogation suits against the city to recover the amount paid by them. The information charges that he solicited this employment. Respondent denies this charge, and the evidence does not establish that his employment by the insurance companies was solicited by him nor does it establish that his employment was initiated by the insurance companies. It appears from the correspondence in evidence that he was of the opinion, and so informed the insurance companies, that by reason of the negligence on the part of the city the amounts paid by them could be recovered by subrogation to the rights of Dora Sampson, then the entire owner of the premises.

The evidence discloses that a larger part of the garage at the rear of the premises at 2011 and 2013 West Division street was destroyed by fire. Respondent contends, and offered some evidence to show, that the store rooms and the apartment above were also injured. It sufficiently appears from the evidence, however, that the only injury to any portion of the premises other than the garage was from the water used in extinguishing the fire. The original proof of loss and damages which was filed with these insurance companies was introduced in evidence, and sets out that the loss and damage to trusses, roofing, carpenter work and material, brick and stonework, sky-light, metal doors, electric wiring, tinwork, stairway, plaster, painting and decorating and removing debris amounted to $4241.94. This proof of loss was signed by Charles A. Sampson and Dora Sampson as the assured and was sworn to by Charles A. Sampson.

David R. Kennicott, an estimator and salesman with McKeown Brothers Company, contractors, who testified that he had adjusted numerous fire losses and told of his experience in estimating damages to buildings by fire, testified that he saw the building after the fire and before it was repaired and formed an estimate as to the damage. It was his opinion that the cost of reconstruction of the building would be about $5000. McKeown & Co. did the reconstruction work on the roof of the garage, for which they were paid the sum of $1502.80, less an allowance for some saving.

L. P. Holland testified that he had been in the general jobbing and repairing business for about thirty years and had made up an estimate of the cost of reproduction of the garage, which estimate was in the form of an offer to reproduce that building for $4765. He testified that the cost to reproduce the building at the time of the hearing on this cause was approximately what it was in 1922; that in 1922 material was a little higher but labor was somewhat

lower. He testified on cross-examination that he could, at the time of the hearing, construct a garage of the type involved here at the price mentioned in his estimate, not figuring electric wiring or cement floor.

Sam Fishkin, a mason contractor, testified that he did repair work on these premises, replacing the walls as they were before, and that his bill was somewhere between $300 and $500; that he did not remember definitely.

William C. Regelin, a real estate dealer of thirty-five years' experience, who testified that he was a member of the appraisal committee of the Real Estate Board of Chicago, had worked with other members and committees and was familiar with the property in question, submitted an estimate of the value of the real estate and buildings. He testified that the land was of the value of $19,200; that the portion of the garage on lot 2011, which is a one-story structure with no basement, 24 x 59 feet, was of the value of $3500; that the building on lot 2013, two stories and basement, with steam heat, he valued at $8000. The rear of 2013, a part of the garage 48 x 66 feet, cement floor, wooden trusses and three greasing pits he valued at $7800, making a total, including land and improvements, of $38,-500; that values there were the same in 1922 as at the time of the hearing, and that he had known this location intimately for twenty years.

As opposed to this evidence, respondent offered the testimony of William A. Callaghan, who testified that he had been in the real estate business for twenty-five years, had done work as a contractor and was familiar with values around the locality of the premises in question; that his estimate of the value of improvements on these lots as of September 15, 1922, was approximately $30,000, the ground was worth $15,000, or a total of $45,000. He testified that he saw the fire and afterwards examined the premises; that the garage was destroyed and the second story part of lot 2013 was pretty well gutted; that the

flames had gone through the stores and their ceilings into the flat above and through a part of the roof; that the former was burned out, rendering the apartment uninhabitable. He testified that he made his estimate ten days before the trial in the case of Sampson *vs.* City of Chicago, and testified in that case that the reconstruction cost would be between $25,000 and $28,000; that the costs in 1922 were higher than at the time of the hearing. He testified on cross-examination that he did not know that the tenant, Bedtke, was re-occupying the apartment one week after the fire. In this case Mrs. Sampson testified that the building, other than the garage, was not damaged except by water. There is no testimony except that of Callaghan of any except minor damage to the premises, other than the garage, by fire, and the proof of loss does not show any such damage other than for certain plaster and stairway work.

The record clearly sustains the contention of the relator that the damage done to the premises in question did not exceed $5000, and that the judgment procured against the city for $23,500 was unreasonable, excessive and not based on facts.

Having in mind this condition of the record, we next proceed to the question whether, as charged in the information, the respondent in the prosecution of this case defrauded the city and overreached and defrauded Dora Sampson. The record demonstrates that neither the city nor the court before whom the case was tried was informed that the owners of the premises had adjusted and settled for the loss and damage with the insurance companies. The record shows that the city filed a plea denying its liability but later admitted liability, as it was established in the case brought by Bedtke, the tenant in the garage, that this fire was caused by the negligence of the city's employee. The Sampson case was called for trial and the witness Callaghan was put on by respondent, as attorney representing the plaintiff. Callaghan testified as we have seen. No

evidence to rebut the testimony of Callaghan was introduced by the assistant corporation counsel, Frank Corr, representing the city, and the claim was compromised by respondent and Corr in open court and a verdict rendered on that compromise for $23,500. The record does not disclose what investigation of the facts was made by the assistant corporation counsel, Corr, but it seems quite evident that had he investigated the matter with care he would have discovered the facts herein referred to.

Counsel for respondent argues that he did not defraud the city or attempt to do so because he knew nothing about the amount of the damage or the proof of loss made by the Sampsons, and was unable to procure a copy of the proof of loss until more than a year after the trial. It is evident, however, that as a lawyer representing the insurance companies he must have known that a proof of loss was executed, and we are at a loss to understand his inability to procure a copy of it or to know of its contents since the relator produced the original on the hearing in this cause. It seems clear that in the suit in which so large a judgment was procured a fraud was committed against the city.

Concerning the charge that respondent overreached and defrauded Dora Sampson the record contains her evidence and his, together with certain facts and circumstances hereinafter pointed out. She testified that she first met respondent in 1927; that he came to her house and told her of trying the case for Bedtke and that he represented the insurance companies, who desired to get back the money they paid to her and her husband in settlement for the damages caused by the fire; that he asked her to sign some papers, which she refused to sign, and that he told her she could be made to sign them, after which she told him that if that was so he had better leave them and she would have someone look at them. She testified that he told her, when she refused to sign the papers, that she had received her money from the insurance companies and she should allow

them to get theirs from the city and that he had seven subrogation papers with him which he wanted her to sign. She testified that he left the papers and she took them to her brother-in-law and had him look at them, and that she later signed them and sent them to him by mail. These were the subrogation agreements which were introduced in evidence and which authorized the company to sue for, compromise or settle, in her name or their names, or otherwise, to the extent of the money paid by them, their claims against the city. Dora Sampson testified that later respondent called her up by telephone and said he had left another paper with her; that she told him she did not see any other paper; that he insisted he left the paper and she insisted he did not; that he did not tell her what the paper was, but that she later understood he claimed that he had left an agreement with her for his employment as an attorney on a contingent fee of fifty per cent of the amount recovered over and above the amount recovered for the insurance companies. This witness states that she did not see any such paper, and that later on, a short time before the trial, he brought out another paper which he wished her to sign, and told her that if she did not want to be bothered with going into court she could sign the paper and she would not need to go to court. This paper was dated March 21, 1928, and is the assignment of her interest in the cause of action to the respondent. She testified that he left the paper and she took it to her attorney, Grover C. Niemeyer, and left it, and that later on she called at Niemeyer's office and signed the paper and mailed it to respondent. She testified that she did not again see respondent or hear anything further about the matter until after the judgment was entered, when she learned from other sources that the judgment for $23,500 had been entered in the case; that she then called upon him and asked him whether what she had seen in the paper was true, and he replied that it was, and that she asked him if that was fair, and

he said, "Well, you signed the paper." She also testified that respondent did not tell her he wanted the assignment because he had made advances and wished to be protected on account of expenses of the suit, and that nothing of · that kind was said. She also testified there was no discussion between herself and respondent in any of their conversations prior to the judgment as to the amount of the recovery over the amount due the insurance companies; that she did not know the amount for which the suit was filed; that she did not tell respondent that she feared she would be held liable for expenses of litigation, and that he did not tell her anything about what the expenses would be or explain to her that if she desired to participate in the litigation she would be entitled to whatever might be recovered over and above the amount due the insurance companies. She also stated that he did not suggest to her that she could employ her own attorney or that she could assign her right of action. She testified she did not attend the trial and knew nothing about it; that she did not tell him that she did not want to be called as a witness but told him the first time she saw him that she had nothing against the city and had nothing coming, and that he did not tell her at any time that he expected to get a judgment much larger than the amount due the insurance companies. She stated that she received a check for $10 from respondent after the assignment was sent to him. She stated on cross-examination that she had told respondent that she did not want to go into court; that she had nothing against the city; that she did not tell him that she did not get near enough from the insurance companies. She testified that she did not know until after the trial of the case that the suit had been filed for the sum of $20,000 or $25,000.

Concerning the relationship of these parties the respondent testified that he was employed by the insurance companies to secure instruments of subrogation; that he called on Dora Sampson and told her he had been employed by

the insurance companies and wished to get subrogation agreements. He stated that she said the insurance companies did not pay her anywhere near her loss on the building and she did not see why she should sign anything to help them get their money and asked him why she could not recover the rest of her loss if the insurance companies could recover theirs, and that he told her she could do so if she could prove any loss, to which she replied she could prove it. He testified that she then asked him if he could represent her in case she decided to go ahead and sue the city, and he told her he did not see why he could not. She asked him if he would represent her on a contingent fee, and he told her he would but that the fee on a contingent basis would be fifty per cent, but that she did not have to employ him but could employ anyone else she wished. He testified that he later took the subrogation contracts out to her and took also an attorney's contract calling for a contingent fee of fifty per cent over and above the amount recovered for the insurance companies; that he explained what the attorney's contract was and left all the papers with her; that he told her he was principally interested in the instruments of subrogation for the fire insurance companies and that she could do as she pleased about the attorney's contract. He testified that during the conversation she asked him how much the suit would be filed for, and that he told her he supposed it should be somewhere between $15,000 to $25,000; that she said she ·did not get near enough damages; that the building was very largely destroyed; that the back porch was entirely destroyed and that the two-story part of the building was damaged to a large extent. He testified that two weeks later he called her on the telephone and asked her about the papers he had left, and that she told him she had not made up her mind; that he again told her he was largely interested in the instruments of subrogation and did not care what she did with the attorney's contract but he wanted her to make up her

mind what she was going to do with the instruments of sub-rogation, and that she said she did not know whether she wanted to sign anything or not. He testified that he later received the subrogation papers. He testified that in his last conversation with her on the telephone she stated she did not know whether she wanted to go into the case or not and did not know whether she wanted to sign the at-torney's contract, and asked him if it would not be better for him to go ahead and start the suit and let her make up her mind later, and he told her it would be possible to do that but it was not desirable from his standpoint. He also testified that he did not discover until some time after the return of the subrogation agreements that the attorney's contingent fee contract had not been returned to him; that considerably later than this he called her on the telephone, and she told him she had not signed the attorney's contract because she did not know whether she wanted to go ahead with a suit over and above the amount sued for by the in-surance companies. He testified that he told her that she would have to make up her mind. He further testified that he thought he had filed the suit for $25,000, but that shortly before March 6, 1928, in a conversation with the assistant corporation counsel who was handling the case, the latter asked him how much he expected to prove, and he replied the amount of the claim was $25,000, and that the assistant corporation counsel reminded him that his *ad damnum* was only $20,000. He testified that the next day he amended the declaration, making the *ad damnum* $25,000. This was some time prior to the assignment which he secured from Dora Sampson on March 21, 1928. Concerning this as-signment he testified that as the case was getting near to a trial he called Mrs. Sampson and told her that he would have to insist on knowing what she was going to do in the matter; that he was in a position of having filed the suit for a considerable amount more than the insurance com-panies had paid and had to know before he went to trial

whether she was in the case or whether she was not; that she could sign the contingent fee contract with him if she desired and go ahead and prosecute it, or she could hire her own attorney and pay her part of the costs and go ahead and prove up her share of the damages, or if she did not want to prosecute any action, to instruct him to withdraw any portion of the case except that for the insurance companies; that she replied she did not want any of the things suggested and that she was sorry she ever signed the instruments of subrogation; that she feared she might suffer some loss, damages or costs since the suit was filed in her name; that she did not believe that respondent would recover any more than the insurance companies had paid, anyway, and that she did not have anything to do with the settlement of the insurance companies or employing the contractors or paying them and that her husband tended to that. He stated that his recollection was that she at that time asked him what amount the suit was filed for and that he told her $25,000. He testified that she told him she was going to make him a proposition that if he would arrange matters so that she would not have to go to court or testify and would guarantee that she would not pay any costs, damages or attorney's fees, that she would give him all that he would recover over what the insurance companies were paid; that he told her that that was an unusual and a foolish proposition, and that she said that she knew it was but that she did not want to go to court and did not want to testify; that she suggested that he draw up an assignment and leave it with her and she would take it to her attorney, and that he returned to his office and two or three days later drew up an assignment and took it out to her and that she said to leave it with her and she would take it up with her attorney, and that later he received the assignment which was introduced in evidence. He repeatedly stated throughout his testimony that he told her he was representing the insurance com-

panies and that he did not care whether she went into the case or not. In his testimony he also told of the transactions occurring in court at the time the judgment was entered.

Grover C. Niemeyer testified that he was the attorney to whom Dora Sampson brought the assignment contract; that he had represented her in some other matters; that he read the assignment and talked with her; that he called up respondent's office and someone talked with him about the question of costs; that after talking with Dora Sampson and respondent's office he wrote a notation in ink in the margin of the contract of assignment to the effect that respondent would save Dora Sampson harmless from any costs or damages, and that she signed it. He also testified that his only conversation with respondent's office was concerning the matter of protecting her from costs or expenses.

Respondent also testified concerning his efforts to make proof of damage, that after receiving an assignment from Dora Sampson he went out into the neighborhood of the buildings to find some real estate person who could qualify as an expert who knew the buildings before the fire, and that he secured the witness Callaghan, who reported the evening before the trial concerning his estimate of the damage caused by the fire.

It is clear from this record that regardless of respondent's testimony that he was not attorney for Dora Sampson, he was not only attorney of record but throughout actively appeared and prosecuted the suit as attorney for the plaintiff. The suit was in her name. Regardless of what may have been said between them, he was from the start of that case the attorney for her interest, which was the amount which might be recovered above the amount paid by the insurance companies. If he was not representing her, the most natural and the proper thing for him to have done was to have brought the suit either in the name of the subrogees or in Dora Sampson's name for the use of such

subrogees, in accord with section 18 of the Practice act. His counsel argues that that act was not in force when the right of action accrued to Dora Sampson. This provision of section 18 of the Practice act was enacted by the legislature in 1925 and was in force when the suit was started and when the subrogation contracts were executed. If he was not representing Dora Sampson's interest the suit was that, only, of the subrogees and under the statute should have been brought either in their names or in her name for their use. This would have disclosed to the city and to the court the interest of the clients whom alone he says he was representing. By filing the suit in the name of Dora Sampson he was able to keep the court and the city from knowing of the existence of the insurance companies as claimants, or of the proof of loss made by the owners at the time of the settlement by the insurance companies. If, as he says, Dora Sampson did not want to sue he had no right to bring suit in her name, and her consent thereto was evidently against her wishes. Respondent says that he did not understand that it was his duty to bring this action in the name of the subrogees or for their use. If, as he says, he was representing only the subrogees, his duty to file the suit in accordance with the permission given by the statute is plain, and the fact that an assignment was taken of the suit brought in her name goes a long way to discredit his statement of ignorance. It seems clear that respondent knew that only by bringing the suit in the manner in which it was brought could he prevent knowledge of the settlement by the insurance companies and the proof of loss by the Sampsons coming to the knowledge of the city and the court.

Dora Sampson testified that she had no knowledge that the suit in her name was for $25,000. Although he denies this, he also testifies that she told him they had lost much more than the insurance companies paid them and herself suggested that she, too, sue the city. Though he testifies

that she later assigned the cause of action to him because she did not want to go into court, it is but natural to suppose that had she known that so large an *ad damnum* was alleged she at least would have communicated that fact to her attorney, Niemeyer, and that he would have discussed it with respondent or respondent's office. Niemeyer testified that the only question he discussed with respondent's office was the matter of protecting Dora Sampson against costs. It is evident that he had no reason to believe that a large judgment was anticipated. Respondent testified that he did not have any reason to believe that such a large amount would be secured. This, however, is not borne out by his actions in the matter, for after talking of a compromise with a representative of the corporation counsel's office, when, as he says, he discovered the *ad damnum* was $20,000, he amended his declaration by making the *ad damnum* $25,000. It was after this that he secured the assignment from Dora Sampson. He also knew before the trial what the testimony of Callaghan would be. These and other facts herein mentioned go a long way in corroboration of the testimony of Dora Sampson that she did not know the amount for which the suit was brought but was led by him to believe that the only result of her assignment of the cause to him would be her protection against costs of the suit. Respondent's conduct in procuring evidence against the city indicated that he did not want Dora Sampson to appear in court.

Counsel for respondent argues that as respondent was not a member of the Chicago or State Bar Association he was in nowise bound by the canons of ethics, and that a reference on cross-examination to section 10, which declares that an attorney should not purchase any interest in a suit which he is prosecuting, was neither binding on him nor properly before the commissioner. Canons of ethics do not have the effect of statutes. They are rules of conduct adopted by bar associations because of their evident right-

eousness and compatibility with the duties of an attorney, and whether respondent was or was not a member of a bar association and what effect the canons of ethics, as such, had, is of no consequence here. It is as unethical for an attorney to purchase an interest in a suit in which he is interested as though the canons of ethics had the force of a statute. The standard of professional and personal integrity of those admitted to practice law is not satisfied by such conduct as merely enables them to escape the penalties of the breach of a statute. Good moral character is a condition precedent to the right of an attorney to practice law. This includes honesty and frankness toward the attorney's client, and such is not consistent with an effort to obtain part of the wealth of another by any wrongful means even though not denounced by criminal statutes. *People* v. *Macauley,* 230 Ill. 208.

Throughout the hearing before the commissioner and throughout the brief and argument of respondent here the position is taken that it is incompetent, on a hearing of this character, to go into the question of the actual damage done to the Sampson property by the fire, for the reason that the judgment in that case is *res judicata.* The charge in this case is fraud—that the judgment was procured as a fraud upon the city and that the assignment of the cause of action was a fraud upon Dora Sampson. Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture. (Bishop's Equity, 206.) If fraud be proved it vitiates all transactions touched by it, and it would be a strange anomaly in the law to say in a proceeding to scrutinize the conduct of an attorney procuring a judgment, that because such a judgment had been procured, however fraudulently, proof of facts showing such fraud could not be

made. We are convinced that respondent not only was guilty of unethical conduct in taking the assignment of Dora Sampson to the cause of action filed in her name, but was also guilty of overreaching and defrauding her in the procurement of that assignment. While she doubtless had the right to bring an action against the city for damages arising from the fire and would not be in such a case bound by the amount of insurance received except so far as her proof of loss might affect the evidence offered, yet this is not such a case. By her testimony and that of respondent she did not want to sue the city, while he says he was not representing her but the subrogees.

The power of the court to disqualify attorneys at law is a judicial power and is not to be exercised in a despotic manner. The hearing is to be governed by rules of law and the evidence must be such as clearly proves the charge. The disbarment of an attorney is a serious matter to him, and this court is bound to weigh carefully the circumstances presented in any disbarment matter. We are of the opinion that the record in this case discloses not only conduct which deprives respondent of the right to expect that confidence of clients to which lawyers should make themselves entitled, but shows a deliberate act on his part procuring for his benefit, by overreaching his client, property rights which, in so far as they existed, belonged to that client, and that he was guilty of a gross fraud against the city. This court cannot condone or permit such conduct if a high standard of integrity on the part of the legal profession is to be maintained. We therefore cannot approve the recommendation of the commissioner that respondent be reprimanded and suspended from practice. Respondent should be disbarred.

The rule will therefore be made absolute.

*Rule made absolute.*