James Lawrence, Appellant, v. Allen L. Thatcher, Appellee.

Gen. No. 43,802.

Opinion filed November 13, 1947. Released for publication December 13, 1947.

JOHAN WAAGE, of Chicago, for appellant.

COCHRANE & GEORGE, of Chicago, for appellee.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

On October 25, 1945, plaintiff confessed judgment on a chattel mortgage note for $2,190.50, upon which execution was issued and served on defendant. Thereafter, pursuant to notice duly served, defendant presented and filed his petition to open judgment with leave to defend. On November 16, 1945, the court sustained the petition and set the matter for hearing on December 6, 1945. Testimony was adduced by both

parties, and on January 18, 1946, the court entered its order finding that defendant had proved the material allegations of the petition, that he was entitled to the relief prayed for, and ordered that the judgment by confession be vacated and held for naught. Plaintiff has taken an appeal from that order.

The petition to vacate, set forth in plaintiff's brief, embraces some nine printed pages. It alleges in detail the salient facts underlying the transaction in which the judgment note and chattel mortgage were given, states that petitioner has a good and meritorious defense to the whole of plaintiff's claim by reason of the facts and circumstances set forth, that he is not indebted to plaintiff in any sum whatsoever, that the sum of $2,000 and the chattel mortgage note upon which judgment had been entered were obtained by plaintiff through fraud and false representation, and accordingly defendant asked that the judgment be opened up and on hearing thereof be vacated, and that the execution issued thereon be stayed.

Upon the hearing the following testimony, as to which there was substantially no dispute, was adduced in support of the allegations of the petition. Defendant was an undertaker engaged in business at 4141 Cottage Grove avenue, and was desirous of securing another undertaking establishment. Plaintiff was also an undertaker, located at 7509 Stony Island avenue, and had been engaged in business at that address for about 20 years. Negotiations for the sale of plaintiff's business to defendant were started early in July 1945. About that time plaintiff received an offer to go to Oklahoma, called defendant to tell him about the offer, and asked if he would be interested in buying his undertaking business if he decided to leave Chicago. Within a day or two defendant came to plaintiff's place of business, and they began to discuss the terms of the sale. Plaintiff testified that defendant "asked me what kind of lease I had. I told him I had a year-

to-year lease; that my lease would expire on the 30th of next April [1946]; he wanted to know how much rent I paid. I told him it was $150 a month.'' Defendant wanted a long-term lease and inquired of the plaintiff as to the names of the owner and the agent of the building. Plaintiff told him that Swan-Lorish on 71st street managed the building, and called Mr. Monaghan, who was in charge of the Swan-Lorish office, told him that he expected to go to Oklahoma, that he had a tentative deal with Mr. Thatcher, the defendant, which was contingent upon his getting a long-term lease, that Thatcher was also an undertaker and would come over to see him. Subsequently defendant told plaintiff that he had talked to Monaghan, who informed him the rent would be raised but indicated they would give defendant a lease such as he desired. The parties then discussed the question of possession. Plaintiff wanted to fix the time as of December 1, 1945, but defendant wanted an earlier date so that he could make alterations before the cold weather set in, and they finally compromised on October 1, 1945. Soon thereafter defendant and his wife called at plaintiff's place of business and took an inventory, and later defendant called plaintiff, told him that he thought everything was settled about his getting a lease, and agreed to meet him on July 30 to close the deal.

The parties met in the office of defendant's attorneys, Cochrane & George, on that date. Plaintiff was accompanied by his counsel. Before proceeding to consummate the transaction defendant said that he again wanted to check on the lease. Accordingly he called Mr. Monaghan, was assured that he would obtain a lease, and announced that he was ready to go ahead. The parties had agreed on the amount to be paid at that time ($2,000) and the date of possession, but the terms as to the balance were still undecided. In compliance with plaintiff's request a note for $2,000, secured by a chattel mortgage, was signed by defendant,

and a Bulk-Sales affidavit and bill of sale conveying the itemized list of goods and chattels, were executed by plaintiff. Shortly thereafter defendant had an architect draw plans for a new front to be installed and for alterations in the interior of the building.

The issue of fact upon which the evidence was conflicting was whether defendant had knowledge of one McCarthy's interest in the premises. Up to the time the transaction was consummated on July 30, 1945, plaintiff had apparently not told defendant that McCarthy was a co-lessee or that he had the right to the use of the furniture until April 30, 1946, when the lease expired. Defendant testified that the first information he had on this subject came to him early in September 1945, when a salesman in his office told him that he had heard McCarthy was on the lease with plaintiff and was threatening to make trouble. Defendant went to see plaintiff, told him what he had heard, and asked whether it was true that McCarthy had an interest as lessee, to which plaintiff replied that he had, but assured defendant that McCarthy would not "make any trouble," that "he will go along" and "he will do anything I say." After learning that McCarthy was a co-lessee defendant contacted Monaghan, who asked plaintiff for a copy of the lease, but plaintiff was unable to comply with this request because the lease was in McCarthy's possession. Plaintiff, however, called on Monaghan September 6 and requested that he write a letter to him and McCarthy, stating that their lease was canceled as of September 30, 1945, because a new lease had been made to defendant. Monaghan complied with this request and wrote such a letter the same day. Upon receipt of the letter McCarthy referred it to his attorney, Edward H. Enright, who on September 13, 1945, advised Monaghan in writing that McCarthy would not consent to a cancellation of his lease and had not authorized plaintiff to do so for him. In the light of this development

defendant's counsel, Edgar George, wrote plaintiff on September 15 advising that his present lease must be turned in and canceled at once; otherwise defendant would rescind the transaction, expect plaintiff to return the $2,000 paid to him and cancel the chattel mortgage, and defendant on his part would reconvey to plaintiff title to the furniture, fixtures, etc.

On October 1, 1945, defendant and his attorney, George, went to plaintiff's establishment. McCarthy and his counsel, Enright, were there, and plaintiff and his attorney were also present. McCarthy refused to give up possession or to permit defendant access to the premises or the furniture and fixtures, and his attorney advised McCarthy to keep defendant out and if necessary to call the police. The next morning he advised McCarthy to change the locks on the place. Several days later Enright and his client met with the parties in George's office, and an effort was made to come to an understanding. Enright took the position that his client should receive $1,500 of the $4,000 purchase price. Plaintiff characterized this request as "absolutely ridiculous," and nothing was accomplished. Subsequently on October 10, 1945, defendant rescinded the transaction, offered to deliver the canceled bill of sale, which had not been recorded, and demanded the return of the $2,000 and release of the chattel mortgage. The request was apparently unheeded. McCarthy remained in possession of the premises and thereafter paid the full rent therefor.

McCarthy's interest in the leasehold and premises was the subject of Monaghan's testimony. He stated that plaintiff had been on the lease alone for many years, but after being discharged in bankruptcy pursuant to a voluntary petition filed by him, owing Swan-Lorish approximately $3,300, the real estate agency refused to give him a lease because of his record of not paying rent. Plaintiff thereupon informed Monaghan that he had a party who would guarantee his lease and

submitted McCarthy's name with references. McCarthy had a position as a plumber with the city, and Monaghan agreed to give them a joint lease.

From other evidence it appeared that McCarthy was also an undertaker and had his name on the window of the undertaking establishment, but plaintiff said that he "had only three or four cases a year which were turned over to him [plaintiff]," and he performed the services.

Plaintiff presented evidence to show that he had introduced McCarthy to defendant as early as July 15, 1945, and told him "that Mr. McCarthy, an undertaker here, . . . is on the lease with me"; also that McCarthy was engaged chiefly in the plumbing business, "had only three or four funerals," and "we never saw him unless he had a case. We took care of most of it" and McCarthy "only had two funerals there last year." On rebuttal defendant testified that he first met McCarthy about July 15 at plaintiff's undertaking establishment; that Charles Green, a salesman, introduced him in plaintiff's presence; that he [defendant] then asked plaintiff about McCarthy and was told that "he runs a few funerals through here, he has two or three funerals in here and he runs them through this establishment"; that nothing was said at that time about McCarthy's being on the lease; that he did not see him at any time thereafter before the transaction was closed on July 30, and that on that day nothing was said with reference to McCarthy's interest in the lease when they met in George's office. He reiterated his statement that he first found out about McCarthy's interest early in September, when one of his salesmen told him that McCarthy was going to start trouble. McCarthy denied that plaintiff mentioned that he was on the lease during the introduction in July, and when the trial judge asked plaintiff the following question, "Prior to the signing of the agreement had there been

any conversation . . . with respect to McCarthy being on the lease?", plaintiff answered, "No, there had not." Monaghan also testified that Swan-Lorish had never thought of McCarthy as their tenant, and as far as the agent was concerned, it was Lawrence's business. The court then asked Monaghan, "How did you happen to make this lease to Thatcher without getting McCarthy's consent to it?", to which Monaghan replied, "Your Honor, I never thought of McCarthy in the matter. Mr. Lawrence came to me and said he was selling out the business and asked me to get the lease, going to a new man, and acting in good faith, I did. McCarthy was not considered." The court next inquired: "Did he say anything to you about McCarthy?", to which Monaghan replied, "Not at all." At the conclusion of the hearing the court gave an oral opinion in which he made findings as to specific material facts. He recognized the conflict in the evidence as to whether there was a disclosure to defendant as to McCarthy's interest in the lease, but concluded as follows: "I believe from the evidence that the Plaintiff, Lawrence, thought that he would have no trouble in inducing McCarthy to surrender the lease, but McCarthy was on the lease, and whether rightfully or wrongfully, he saw an opportunity to capitalize on that. I find that McCarthy had a right to use the undertaking establishment, as he testified, for the period of the lease. I find that the Defendant Thatcher was led to believe that the only right which McCarthy had was the right to use the undertaking establishment from time to time for the purpose of operating his funerals through that establishment. I find it was the duty of the Plaintiff, Lawrence, to advise the Defendant, Thatcher, that McCarthy was on the lease with him and that he could not get possession October 1, 1945. I find also that it was the duty of the Plaintiff, Lawrence, to advise the Defendant, Thatcher, of the right to the use of the property which McCarthy had

and that he failed to do so." Considering the fact that defendant paid a valuable consideration for the undertaking establishment, which included the chattels, good will and the use of the premises under the unexpired lease, and that plaintiff had agreed to yield possession on October 1, 1945, so that defendant could make the necessary alterations and repairs and lose no further time in taking over the business, it was of paramount importance that these privileges, for which he had paid, should not be defeated by any right that McCarthy had in the premises and the leasehold; and if plaintiff had advised defendant of the true facts it is, to say the least, doubtful if defendant would have entered into the transaction. In other words, plaintiff's omission to disclose the full facts, and his suppression of the truth as to McCarthy's interest, amounted to a species of fraud which was calculated to deceive defendant. The court who heard the witnesses and was in a position to judge their credibility found that there was no disclosure to the defendant of the fact that McCarthy was on the lease and that he had a right to the use of the undertaking establishment. The authorities are fairly in accord in holding that there is no general rule for determining what facts will constitute fraud, and they say that it will be found or not according to the special facts of each particular case. "It may consist in a misrepresentation, that is, in the positive assertion of a falsehood, or in the creation of a false impression by words or acts, or by any trick or device, or in a concealment or suppression of the truth, or in both a suggestion of falsehood and a suppression of truth together." 12 R. C. L., Fraud and Deceit, sec. 4, p. 232. In *People v. Gilmore,* 345 Ill. 28, the court held that "Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture."

■ ■ Defendant's carefully prepared petition to open up and defend against the judgment, which is set forth *verbatim* in plaintiff's brief, is supported by the evidence and the findings of the court. It sets up a meritorious defense and complies with the provisions of par. 259.26 of the Civil Practice Act (Ill. Rev. Stat. 1945, ch. 110 [Jones Ill. Stats. Ann. 105.26]). The petition recited in detail the facts of the entire transaction and had attached thereto copies of all pertinent documents involved, and after a careful examination thereof we are convinced that it sets forth a *prima facie* case on the merits to the whole of plaintiff's demands. It is significant that plaintiff never questioned the sufficiency of the petition, but contented himself to go to trial on the merits. Nevertheless, he characterizes the petition in his brief as "utter vacuity of substantial material and meritorious matters," adds that he found it impossible to intelligently state its substance in abbreviated abstracted form, and therefore asks to be pardoned for copying it *verbatim* in his brief. If it was so utterly lacking in merit and in its failure to set out a *prima facie* case, we find it difficult to understand why plaintiff did not challenge it by proper motion to test its sufficiency. In any event he elected to abide by the finding of the court upon a trial of the allegations of the petition, and since, as we believe, the facts disclosed by the proofs fully sustain the trial judge in his decision and findings, the judgment of the superior court should be affirmed, and it is so ordered.

*Judgment affirmed.*

SCANLAN and SULLIVAN, JJ., concur.