No. 3--05--0796

filed April 17, 2006.
_____
_____

IN

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2006

| | | |
|---|---|---|
| In re O.S., | ) | Appeal from the Circuit Court of the |
| | ) | 10th Judicial Circuit, |
| a Minor | ) | Tazewell County, Illinois |
| | ) | |
| (The People of the State of | ) | |
| Illinois, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 01-JA-42 |
| | ) | |
| I.J.W., | ) | Honorable Albert L. Purham, Jr., and |
| | ) | Richard D. McCoy, |
| Respondent-Appellant). | ) | Judges, Presiding. |

JUSTICE McDADE delivered the opinion of the court:
_____
_____

The respondent-mother, I.J.W., was found to be an unfit parent, and her parental

rights to O.S. were terminated.  The mother appeals, arguing that it was not in the

minor's best interest to terminate her parental rights.  We vacate the order of the circuit

court of Tazewell County and remand for additional proceedings.

FACTS

The State filed a juvenile petition for wardship on May 15, 2001, alleging that

O.S., born August 28, 2000, and his two older half-sisters (born August 28, 1995, and August 7, 1996) were neglected. All three minors were removed from the mother's custody, and in July 2001, O.S., at age ten months, was placed in the foster home where he currently still resides. The minors were returned to the mother's custody on October 5, 2001. However, on October 24, 2001, the State filed a new juvenile neglect petition alleging that the minors were in an injurious environment due to the mother's drug use.

On January 4, 2002, the trial court entered a finding of neglect, and, following dispositional proceedings, the minors were made wards of the court. The court awarded guardianship to the Department of Children and Family Services (DCFS) and its designee, Lutheran Social Services (LSS). O.S. was returned to the same foster home and the two daughters were placed with their paternal grandparents.

In February 2002, the mother was convicted on several Class X controlled substance (methamphetamine) charges. Following her conviction, she was held in custody in the Peoria County Jail from February 2002 until October 2002, when she was transferred to the Department of Corrections (DOC). She was released from the DOC on February 24, 2004.

Determination of Unfitness

In April 2003, the State petitioned for termination of parental rights, alleging, *inter alia,* that the mother was unfit because she failed to make reasonable progress toward the return of the minors to her within the nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(iii) (West 2002). For eight of the nine months following that adjudication, the mother was housed in the Peoria County Jail. The following 16

2

months, she was in the Department of Corrections.

Respondent has asserted that her LSS caseworker, Jennifer Coziahr, attempted only once, unsuccessfully, to contact her by phone during that period, and that the caseworker never visited her during the two years of her incarceration. Although Ms. Coziahr mailed service plans to her, LSS made no services available to respondent throughout the period of her incarceration. Nonetheless respondent completed numerous courses offered by the DOC attempting to address her addiction and poor life choices. These included anger management, domestic violence, substance abuse education and treatment, advanced parenting, recovering from addictive thinking, co-dependency group, lifestyle redirection, inner child healing, the GED constitution test, and growth, acceptance and endurance training.

Even after her release, the caseworker, according to respondent, offered her "little to no help" and, in fact, actively misrepresented facts to the psychologist and, *via* the best interest report, to the court.

On June 18, 2004, four months after respondent's release from prison, the trial court conducted a hearing on the State's petition to terminate the mother's parental rights. At the conclusion of the hearing, the court found that the State had proved the mother's unfitness by clear and convincing evidence.

The Best Interest Determination

The several hearings of the best interest proceedings began April 14, 2005, and concluded on October 26th of that year. The best interest report from LSS recommended that the mother's parental rights be terminated so that the minors could have permanency through adoption or guardianship. The report indicated that although

3

the mother had completed most of her required services since her release from the DOC, she continued to associate with individuals who were engaged in criminal activity, including narcotics, and she had been convicted of driving under the influence of alcohol in December 2004.

The report further noted that O.S. had been placed in his foster family's home in July 2001. He was then ten months old. His sense of identity had been formed in the foster home, and he had been fully integrated in the foster family's life. O.S. identified with his foster parents as his mother and father. The foster parents wanted to adopt O.S.

The bonding assessment indicated that O.S. had suffered several disruptions in the bonding relationship with his mother due to her neglect of him and her drug use. They had, at best, an insecure attachment.

Testimony was heard regarding the minors' visitation with the mother while she was incarcerated and after she was released. With regard to in-prison visitation, the caseworker, Jennifer Cozaihr, stated that in February 2002, LSS determined not to allow the mother visitation with the minors while she was incarcerated. Cozaihr explained that LSS is generally opposed to young children visiting parents in what LSS calls such an inappropriate setting as prison. In November 2002, the court entered an order, over objection of both the mother and the guardian *ad litem*, prohibiting any prison visits with the minors. In June 2003, 16 months into her incarceration, the mother, upon her own oral motion, was allowed telephone contact with the minor children.

In late August 2003, the mother, by motion, sought in-person visitation with her

4

children.  Thirty days later, the court authorized monthly visits with her daughters, but not her son.  The court did order that the mother could continue visiting O.S. by telephone and directed DCFS to submit an in-person visitation plan for O.S. within 30 days.  In October 2003, the parties agreed  that the services of a licensed clinical psychologist should be retained.  The court ordered LSS to identify the psychologist and prepare the previously ordered visitation plan.  The court wanted the psychologist to address ways in which any trauma that might be occasioned by reintroduction of the child to the mother could be reduced or eliminated.  Dr. Michael Trieger, Psy.D., evaluated the child in December 2003.  Dr. Trieger reported that the twice-weekly calls with his mother had not been traumatic to O.S., but he thought contact visitation would be.  He recommended short once or twice weekly meetings at a park or indoor play area familiar to O.S., that the foster mother be present, and that respondent not be introduced as his mother but as a relative named "Jenny."

No plan was tendered by LSS until March 2004 -- a month after respondent had been released from prison and six months after its original due date.  The only recommendations of Dr. Trieger that LSS adopted were that O.S. be accompanied to visitation by his foster mother and that he not know that respondent was his mother.

Thus, after the mother's release and after not being allowed any physical contact with him for the full two years of her incarceration, visitation with O.S. was resumed by court order.  However, mother and son could only meet at the LSS office and O.S. was not allowed to know that she _was_ his mother.  She was not permitted to refer to herself as his mother and he was not allowed to call her anything but "Jenny."  Only two visits per month were authorized rather than once or twice a week as the psychologist had

5

recommended, although the twice weekly phone calls with "Jenny" could continue.

O.S. had regular visits with his sisters and, although he knew that respondent was their mother and they were his sisters, they were forbidden to let O.S. know that she was *his* mother as well. Indeed, the trial court ordered respondent, under threat of termination of family visits, to secure her daughters' compliance with the deception that she was not their brother's mother. Despite her compelled concealment of their mother-child relationship, respondent never missed a scheduled visit with O.S.

Not surprisingly, the bonding assessment showed that O.S.'s primary attachment was to his foster parents and his relationship to the mother was akin to that of a child to an aunt. His foster parents facilitated regular visitation between O.S. and his half-sisters, who were still with paternal grandparents. As a result, O.S. had a strong bond with his half-sisters.

After hearing arguments, the trial court concluded that it was in the best interest of O.S. to terminate the mother's parental rights. The court found that the statutory factors overwhelmingly supported termination of the mother's parental rights, and granted the State's petition as to O.S. At the same time, the court found respondent fit as to her daughters, obviating the petition to terminate as to them. The mother appeals only the termination of her parental rights to O.S.

## ANALYSIS

The mother argues that the trial court erred in finding that it was in O.S.'s best interests to terminate her parental rights. Specifically, the mother asserts that decisions made by the court, DCFS and LSS regarding visitation with O.S. "predetermined" the outcome of the case.

6

Once a finding of unfitness has been made, all considerations must yield to the best interest of the child. In re M.C., 197 Ill. App. 3d 802, 555 N.E.2d 111 (1990). At this stage of the proceedings, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. In re D.T., 212 Ill. 2d 347, 818 N.E.2d 1214 (2004). The court's decision requires consideration of statutory factors, including, *inter alia*: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (4) the risks related to substitute care; and (5) the preferences of persons available to care for the child. 705 ILCS 405/1--3(4.05) (West 2004). On review, the trial court's determination will not be disturbed unless it is contrary to the manifest weight of the evidence. In re R.L., 352 Ill. App. 3d 985, 817 N.E.2d 954 (2004).

In the instant case, the evidence adduced at the best interest hearing revealed that O.S. was thriving in a safe and clean foster home. He had bonded with his foster parents. In fact, he had been in the foster home since he was less than a year old. (He is now five.) The foster parents expressed a desire to provide permanency for O.S. through adoption. The record further reveals that the statutory best interest factors favored the decision reached by the trial court and that it was, in fact, in the best interest of the child that his mother's parental rights be terminated. Because of that fact, it would appear at first blush that the decision of the circuit court of Tazewell County should be affirmed.

We emphasize that the mother's drug use and incarceration were certainly major and significant contributors to her loss of custody in 2001 and the impairment of her

7

relationship with O.S.  We make no excuses or apologies for her or her conduct.  We agree with LSS that the children were then in an injurious environment from which they needed to be removed immediately.

Respondent has, however, asserted in this appeal that the best interest finding in October 2001 was "predetermined" by decisions made by LSS and the court during the four years preceding the best interest hearing itself.  Courts frequently recite – as did we in the early part of our analysis – that following a finding of unfitness, all considerations yield to the best interest of the child.  This case raises a question of precisely *what* that means.  Because that issue has not previously been presented to us in this form, we feel it is necessary to examine the conduct of and procedures followed by the State, the court, and the involved agencies in this case in light of their statutory charge.

Statutory Background

The relevant statute is the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.*) (West 2004), particularly Article II, Abused, Neglected or Dependent Minors.  The stated purpose of that Act is, in pertinent part:

> "(1) The purpose of this Act is to secure for each minor
>
> subject hereto such care and guidance, preferably in his or
>
> her own home, as will serve the safety and moral, emotional,
>
> mental, and physical welfare of the minor and the best
>
> interests of the community; to preserve and strengthen the
>
> minor's family ties whenever possible, removing him or her
>
> from the custody of his or her parents only when his or her
>
> safety or welfare or the protection of the public cannot be

adequately safeguarded without removal; if the child is removed from the custody of his or her parent, the [DCFS] immediately shall consider concurrent planning *** so that permanency may occur at the earliest opportunity; consideration should be given so that if reunification fails or is delayed, the placement made is the best available placement to provide permanency for the child; and, when the minor is removed from his or her own family, to secure for him or her custody, care and discipline as nearly as possible equivalent to that which should be given by his or her parents, and in cases where it should and can properly be done to place the minor in a family home so that he or she may become a member of the family by legal adoption or otherwise. * * *

"(2) In all proceedings under this Act the court may direct the course thereof so as promptly to ascertain the jurisdictional facts and fully to gather information bearing upon the current condition and future welfare of persons subject to this Act. This Act shall be administered in a spirit of humane concern, not only for the rights of the parties, but also for the fears and the limits of understanding of all who appear before the court.

"(3)     * * *

(c) The parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the health, safety, and best interests of the child.

"(4) This Act shall be liberally construed to carry out the foregoing purpose and policy." 705 ILCS 405/1-2 (West 2004).

As can be seen, the Act strives to maintain and strengthen family ties, only removing a child from the family home and the custody of its parents when the safety and well-being of that child or the community so dictates. It can also be seen that the Act creates a tension for DCFS or its designee requiring a careful balance between taking diligent steps to assist parents in their efforts at remediation and reunification on the one hand and placing children in foster homes that effectively substitute for a warm and caring family environment on the other. The Act recognizes, both implicitly and explicitly, that it covers people who are failing at their parental responsibilities but who should be given assistance in the development of proper skills and adequate information to provide the non-injurious environment to which their children are statutorily entitled. See 705 ILCS 405/2-3 (West 2004) (defining neglected and abused minors). It seems that a logical adjunct to these mandates is a "hold harmless" factor that allows us to de-emphasize past deficits when the parent succeeds in substantially conforming his or her behavior to appropriate levels of nurture and protection of their children within a reasonable time. See 750 ILCS 50/1(D)(m) (West 2004).

Misapplication in This Case

Unfortunately, the well-intentioned decisions made by the court and LSS

10

(partially on the advice of the clinical psychologist) unfairly weighted the Act's policy goals and skewed the court's ability to fairly balance the Act's best interest factors. We, therefore, attempt to assess the extent to which such skewing is legitimate and/or statutorily authorized.

The reason for the removal of the children from the custody of respondent was neglect caused by her addiction to methamphetamines. She was convicted of drug-related offenses, incarcerated for two years, and released. Throughout the period of her incarceration and for all the time between her release and the termination of her rights, the State, the court, and the involved agencies created a fiction that respondent was not O.S.'s mother for purposes of visitation. This fiction actively impeded the development of any parental bonding between respondent and her son and frustrated one of the goals the legislature set in the Act.

Respondent has demonstrated substantial compliance with the requirements imposed by the State. While in prison, she earned certificates of completion in classes on anger management, domestic violence, substance abuse education and treatment, advanced parenting, recovering from addictive thinking, co-dependency group, lifestyle redirection, inner child healing, the GED constitution test, and growth, acceptance and endurance training.

Since her release from prison, all of her random urine drops have been negative for drugs and she asserts that she has never had a relapse into the use of methamphetamines. She completed the psychological evaluation, attended required counseling with positive reports, attends AA/NA meetings on a regular basis (occasionally being asked to teach), has maintained gainful employment since her

11

release, has her own private residence, and attends church services and participates in some community activities.

She admits to a conviction for driving under the influence of alcohol in December 2004 but has completed all of the treatment required as a result of it. To put that conviction in some perspective, she points out that she has never been addicted to alcohol and it was not a factor in the removal of her children. LSS also reported that she has continued to associate with individuals who were engaged in criminal activity. We do not know specifics of what that is, but it does not appear from the record to have undermined her considerable progress.

It was presumably because of these life and lifestyle improvements that she was found fit with regard to her two daughters, obviating a termination of rights as to them. It is possible that, looking at some of the best interest factors, she is also fit as to O.S. However, since no such finding was made by the trial court, the determination of what was in the best interest of O.S. had to be made.

Respondent has correctly stated that the majority of the best interest considerations (9 of 14) center on the relationship of and bonding between parent and child. Logically it would seem then that the loss of her son is largely, perhaps solely, attributable to the failure of mother and son to effectively bond.

The trial court stated in making the best interest finding:

"We're not here at a best interest hearing to assess fault or blame. Instead we are here to simply ask, What is in the best interest of [O.S.]? When we do that, I think that it's fair to say that no matter why or how we got to this point matters. The only question is, Now that we find ourselves

in the circumstances as they now exist, what's in the best interest of [O.S.] as it relates -- well, not as it relates, but as it is contemplated in under the mandatory statutory best interest factors?

Bearing all of that in mind, in this case it is overwhelmingly--and by that I mean it exceeds in mere preponderance of the evidence test that the best interest of [O.S.] calls for a termination of parental rights. The only factor which disfavors, although insubstantially in this case, but the only factor which would disfavor termination is [O.S.]'s relationship with his sisters. But as I have more that simply implied, as I have expressed that consideration is overwhelmed by all of the other statutory factors."

Certainly he was correct in eschewing an assessment of fault or blame. That has not been understood to be the court's function in a best-interest hearing.

What *is* a major component of the court's function is to assess the relative degree to which the child has bonded to his foster parents and his biological parent, taking into consideration the natural harm to the relationship caused by the parent's derelictions. See 750 ILCS 5/602 (West 2004) (best interest factors). However, it seems that any harm to the parent's relationship with the child must be assessed absent artificial or coercive intervention of others into the bonding process. Such an assessment could not be made in this case, and there has, therefore, been a fundamental injustice to respondent. The issue is whether such injustice was contemplated by the legislature and warranted by the statute.

The first concern is constitutional. Parents have a constitutional right to the custody of their children with all the rights and responsibilities that custody entails.

13

*Wickham v. Byrne*, 199 Ill. 2d 309, 316, 769 N.E.2d 1, 5 2002 One of the fundamental rights protected under the fourteenth amendment is the right of parents to make decisions concerning the care, custody, and control of their children without unwarranted state intrusion . The right, though fundamental, is not absolute. *Wickham*, 199 Ill. 2d at 316, 769 N.E.2d at 6 ("State interference with fundamental parental childrearing rights is justified in limited instances to protect the health, safety, and welfare of children"). If the State deprives parents of that right, the deprivation must comply with principles of due process. *Wickham*, 199 Ill. 2d at 316, 769 N.E.2d at 5 due process clause grants heightened protection against government interference with fundamental rights of parents . Due process in this instance is achieved by compliance with the provisions of the Juvenile Court Act and fundamental fairness.

As previously noted, the Act specifically states that a parent's rights shall not prevail when the court determines that it is contrary to the health, safety, and best interests of the child. 705 ILCS 405/1-2(3)(c)) (West 2004). It then establishes an elaborate and carefully tailored scheme to effect a balance between the constitutional rights of parents and the statutorily-created rights of children to health, safety, and protection. 705 ILCS 405/2-1 through 2-33 (West 2004). The scheme does not contemplate actual affirmative impedance, except in the case of harmful or injurious conduct of the respondent parent(s), of the family reunification that is among the stated goals of the Act.

The statute nowhere suggests or condones decisions of child welfare agencies, enforced by the courts, prior to the best interest hearing that allow a parent to believe that she is progressing toward reunification while *ensuring* that she will fail the best interest test. When the actions make the best interest hearing a futile gesture there has

14

been a violation of due process tainting the constitutionality of the termination of respondent's parental rights.

The second concern is the integrity of the judicial process and confidence in the fairness of our courts as expressed within the policy of the Act. The Act directs that it "shall be administered in a spirit of humane concern, not only for the *rights* of the parties, but also for the *fears and the limits of understanding* of all who appear before the court. (Emphasis added.) 705 ILCS 405/1-2 (2) (West 2004). We have no business allowing or facilitating deception in family matters, and certainly none enforcing it by threat of judicial reprisals. Citizens have the right to expect the courts to follow the law, deal honestly and fairly with the parties, and to be neutral arbiters, not partisans. LSS had duties to both respondent and all of her children. The court has the duty to fairly balance the interests of all parties before it. This mother and these children did not see that happening.

At some point, O.S. will learn of and have to deal with the deception about the identity of his mother that was mounted by LSS and enforced by the court, ostensibly in his psychological best interest. So, too, his sisters (who were also parties to be protected by the court) will have to reconcile their court-ordered participation in the deception with their developing concepts about fairness, honesty, justice, and the justice system. All of the children, and particularly O.S., will have to come to grips at some point with the fact that their mother was denied, not only for the two years of her incarceration but also for two years following her release, the opportunity to visit with her son -- as his mother -- and attempt to nurture (or re-establish) a familial bond with him.

15

Clearly, LSS obeyed the statutory command to place O.S. with a warm, caring family who could provide a good home for him in the event reunification failed. And it is quite possible that O.S. and his mother might have failed to bond even in a customary type of visitation situation. However, the agency has, by its actions, virtually ensured that reunification with O.S. would fail. If the best interest of the child immediately becomes the *sole* consideration only upon the finding of unfitness (in this case on June 18, 2004), then the agency and the court had a statutory duty to take actions to foster and encourage reunification throughout the term of respondent's incarceration and for four months thereafter.

But there is also ample evidence in the statute that the parent does not immediately lose all consideration upon being found unfit. He or she has the opportunity to reverse a finding of unfitness up to and including the best interest hearing. Indeed, that happened in this case with regard to respondent's daughters. When a child has been made a ward of the State, the Act leaves the parent whose parental rights have not been terminated with residual rights that include reasonable visitation. That same section also permits the court to limit, by court order, such visitation in the best interest of the child. 705 ILCS 405/1-3(8)(b) (West 2004).

In this case, the court-enforced restrictions on frequency, place, and nature of the interaction robbed the visitation of all its usual and meaningful attributes. The State might just as well have prohibited all visitation. The decisions made by the agency and enforced by the court forced the child to view respondent not as his mother but as a less intimate, more remote relative. Her parental rights were then terminated, in significant measure, because O.S. related to her as an aunt, not a mother.

16

We are acutely aware of the statutory encouragement of early resolution, stability, finality, and security for the child. It also appears from the record that if O.S. were adopted by his foster family, he would be happily living in a warm and nurturing environment with people who love him. What the record cannot show us -- because LSS and the court did not facilitate, or even allow, meaningful visitation -- is whether O.S. could also be happily living in a warm and nurturing environment with people who love him if he were reunited with his mother and his sisters. We believe the Act requires trial courts to be vigilant in ensuring that their interim decisions, guided by recommendations of the State and the agencies, adequately and fairly balance the rights of all parties before them to address and satisfy all of the statutory goals. We therefore hold that a termination of respondent's parental rights under these circumstances would be a deprivation of her constitutional right to custody of her son without that due process of law prescribed by the Juvenile Court Act and would undermine the perceived integrity of the judicial system.

The deception perpetrated on O.S. fits within the definition of "fraud" cited by our supreme court as follows:

> "Fraud, for purposes of the Adoption Act, is defined as 'anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture.'
> *Regenold v. Baby Fold, Inc.,* 68 Ill. 2d 419, 435, 369 N.E.2d 858,

17

[] (1977), quoting *People ex rel Chicago Bar Ass'n v. Gilmore,* 345

Ill. 28, 46, 177 N.E. 710 (1931). Where such fraud is proved, it

vitiates all transactions touched by it. *Gilmore,* 345 Ill. at 46." *In*

*re Adoption of E.L., A minor,* 315 Ill. App. 3d 137, 151, 733

N.E.2d 846, 858 (2000).

We emphasize that we are not saying that the court or LSS engaged in fraudulent conduct. The specific *intent* of the deception was not harm to the mother but rather the benign interest in minimizing the child's possible trauma at learning that his foster mother was not his real mother. While the expressed intent of LSS and the court was not to harm the mother in this case, that is nonetheless the precise result. They presumably unwittingly committed a significant injustice to her and to her rights as a parent. We also freely acknowledge that *In re E.L.* has vastly different, more egregious facts; was litigated pursuant to the Adoption Act [750 ILCS 50/1 *et seq.* (West 2004)]; and does not have a wayward biological parent. Nonetheless, we believe that a fair analogy can still be drawn and that the basic principles expressed by the *E.L.* court are equally applicable here.

In the present case, we have a continuing "suppression of truth or suggestion of what is false *** by direct falsehood or by innuendo." If, indeed, such conduct vitiates all transactions touched by it, the best interest hearing that concluded in October 2005 is a nullity.

Moreover, as the *E.L.* court observed:

"[T]he continued deception allows potential adoptive parents

additional time to further bond with a child. In practical terms, the

longer a party has custody of a child before a best interests hearing

18

occurs, the greater the chance that the best interests of the child will lie with the child remaining in their care." *In re E.L.,* 315 Ill. App. 3d at 155, 733 N.E.2d at 860.

In the present case, the impact of the deception on the best interest determination was two-fold: (1) it allowed the potential adoptive parents additional time, *unimpeded by maternal claims of respondent,* to further cement their ties with O.S. and (2) it denied respondent the right (and reasonable opportunity) to pursue efforts to restore her parental bond with her son and to achieve the family unification that she was making substantial efforts and progress to regain. To allow the best interest finding to stand in these circumstances rewards the deception, is unfair and unjust, and violates both the statutory scheme and public policy.

Accordingly, we vacate the order of the circuit court of Tazewell County and remand the matter for further proceedings.

On remand, we direct the court to establish a period of time not less than one year nor more than two years to allow visitation between O.S., his sisters, and respondent, identified to him as his mother, in the kind of happy environment (park or recreational facility -- and perhaps respondent's home) and with the frequency recommended by the psychologist, Dr. Trieger, who has previously been selected by LSS and approved by the court. We acknowledge that respondent faces an uphill battle to win the trust and affection of a child who has had nearly six years of uninterrupted residence with his foster family and who will continue to live with them through the period of visitation with his biological family. Mother and son may fail to bond – and that may be a just outcome since it was her conduct that originally caused his removal from

her custody – but at least she will have as fair an opportunity as is still possible in this case to regain her son and reunite her family. At the end of the designated period, the court shall hold another best interest proceeding to assess the optimal placement for O.S. and determine the respondent's parental rights.

The order of the circuit court of Tazewell County is vacated and the matter remanded for further proceedings consistent with this decision.

Vacated and remanded.

BARRY AND O'BRIEN, JJ., concurring.