In re ADOPTION OF E.L., a Minor (J.L., Petitioner-Appellant and Respondent-Appellant, v. F.A. *et al.*, Petitioners-Appellees and Respondents-Appellees).

First District (2nd Division)   Nos. 1—99—2070, 1—99—2465, 1—99—2676 cons.

Opinion filed June 30, 2000.

138

Richard Cozzola, Diana White, Emily Friedman, and Ruth Giles Ott, all of Legal Assistance Foundation, of Chicago, for appellant.

Richard A. Lifshitz and Uve R. Jerzy, both of Mandel, Lipton & Stevenson, Ltd., of Chicago, for appellees.

Richard A. Lifshitz, of Mandel, Lipton & Stevenson, Ltd., Michael P. Doyle, Assistant Attorney General, Edward J. O'Connell, and Maurice Albin, of Sigel, Albin, Landau & Rubin, all of Chicago, for *amici curiae*.

JUSTICE McBRIDE delivered the opinion of the court:

Appellant J.L. intervened in an adoption proceeding in which appellees F. and P.A. (the A.s) had adopted J.L.'s biological daughter, E.L. J.L. filed verified petitions seeking to set aside the adoption based on lack of jurisdiction and fraud. After J.L. moved for summary judgment on the petitions, the trial court vacated the final judgment order of adoption and proceeded to hold a custody hearing pursuant to section 20 of the Adoption Act (750 ILCS 50/20 (West 1998)). Following the

hearing, the court awarded legal custody and guardianship of E.L. to J.L., awarded the A.s physical and residential custody of E.L., and directed that the parties draft a joint parenting agreement. After the parties were unable to agree on a joint parenting agreement, the court entered a joint parenting order. J.L. has appealed from the trial court's order vacating the judgment order of adoption, the trial court's order from the custody hearing, and the joint parenting order entered by the trial court. The three separate appeals have been consolidated before the court in this action.

## I. Facts

The facts of this case, as set forth in the record, are as follows. E.L. was born on July, 13, 1995. Her mother, Marisa R. (Marisa), is the only parent listed on the birth certificate. J.L., E.L.'s biological father, was present for her birth and was living in the same apartment building as Marisa at the time of E.L.'s birth. Upon returning from the hospital, Marisa and E.L. stayed with J.L. in his apartment for 2 to 2¹/₂ months. Marisa then returned to her own apartment. Although J.L. and Marisa continued to live in the same apartment building, they did not continually live in an apartment together again until 1996. J.L., however, continued to be involved in E.L.'s care prior to the time he and Marisa moved in together. Six months after her birth, E.L. was baptized. Marisa and J.L. were listed on the baptismal certificate as her mother and father. J.L.'s brother and sister were E.L.'s godparents. On June 19, 1996, when E.L. was almost a year old, a Cook County circuit court entered an agreed order of parentage and support naming J.L. as E.L.'s father and ordering him to pay child support.

On May 28, 1997, two months prior to E.L.'s second birthday, J.L. and Marisa were married. Around September 1997, Marisa began to spend less and less time at home with J.L. and E.L. There was some testimony to suggest that Marisa was the victim of a rape that same month. Shortly thereafter, Marisa left the marital home and E.L. and J.L. lived together in an apartment with J.L.'s sister. When J.L. was at work, various relatives would watch E.L.

Marisa returned to the marital home in mid-January of 1998, after promising J.L. that she would change by stopping her drug use and drinking and by devoting herself to the family. J.L. accompanied Marisa to an appointment with a psychiatrist. The psychiatrist made various recommendations but Marisa failed to follow up on them. On January 15, 1998, Marisa requested that J.L. be allowed to stop child support payments due to the fact that she and J.L. were now married. In February 1998, J.L. was hospitalized for five days with stress-related chest pains. Shortly after he returned home, J.L. told Marisa that she

had not changed her ways and was not welcome in the home. Marisa wanted to take E.L. with her and J.L. protested. Marisa left and returned with the police, who allowed Marisa to leave with E.L.

J.L. did not know where Marisa was staying. For a number of weeks after Marisa left, she would call and promise to let him see E.L. but would never follow through on her promises. J.L. looked for E.L. in the parks and other places he thought Marisa might take her but his search was unsuccessful.

J.L. testified that he also went to two different police stations seeking help in recovering E.L. Both times he was told that because E.L. was with her mother, there was nothing the police could do. This was corroborated by the testimony of Chicago police officer Ronald Magro. Officer Magro testified that, in March 1998, J.L. came to the fourth district police station and reported to him that his wife, who was on narcotics, had taken their daughter to Indiana against his will and that he was interested in regaining custody of his daughter. Because E.L. was with her mother, Officer Magro did not have a basis to make out a report, but he did refer J.L. to his brother-in-law, who was a Whiting, Indiana, police officer. Although J.L. later sought out Officer Magro's brother-in-law in Indiana, the officer was unable to help due to J.L.'s lack of specific information on Marisa's whereabouts.

Meanwhile, F. and P.A., residents of Pompano Beach, Florida, were seeking to adopt a child. The A.s owned and operated a car repair and sales business and had been married since 1979. In 1996, friends from Illinois suggested that they call Chicago lawyer Larry Raphael for help in adopting a child. They contacted Raphael and paid him $3,000 to place ads on their behalf seeking a child to adopt.

The record indicates that Raphael was suspended from the practice of law in Illinois in February 1997 and disbarred in May 1997.

In March 1998, Raphael contacted the A.s to tell them he had found a two-year-old girl who was available for adoption through an adoption agency called New Beginnings. Raphael told the A.s that the child's mother was going through a divorce and that the man she was married to was not the father of the child. On March 8, 1998, the A.s traveled to Chicago and met Raphael. Raphael informed them that the biological father, who was not a part of the child's life, had given up his rights to the child and that the mother of the child wanted to meet them. Raphael brought Marisa to the hotel room where the A.s were staying. After an emotional meeting, Marisa left and Raphael then brought E.L. to the room. E.L., who was 2½ years old at the time, stayed with the A.s that night and has been in their physical custody from that day forward. E.L. was turned over to the A.s with only the clothes she was wearing. She did not have any toys or other items familiar to her.

The next day, Raphael introduced the A.s to his "associate," Louis Capozzoli, and told the A.s that Capozzoli would be handling the adoption for him. The A.s appeared in court with Capozzoli that same day, March 9, 1998, to file a petition to adopt, and then stayed in Illinois several additional days waiting for clearance to take E.L. out of state. Filed as part of the adoption proceeding, as required by statute, was an "Affidavit of Identification" executed by Marisa in which she averred that E.L.'s biological father was a man named Theodore Perez-Gonzalez. The court granted temporary legal custody of E.L. to the A.s through an interim order which also terminated the parental rights of Marisa and Perez-Gonzalez. While in Chicago, the A.s paid approximately $5,000 in cash to Capozzoli and prepared a check in the amount of $12,650 for an organization called Adoption Consulting Services. The A.s wrote a check to Raphael for an additional $1,000 after returning to Florida. Checks given to Raphael and the check to Adoption Consulting Services were all deposited into an account belonging to Raphael. The A.s were never asked to make any payment to New Beginnings, the agency handling the adoption. Both Rita Sankey, on behalf of New Beginnings, and the A.s signed affidavits filed with the court stating that $17,000 had been paid to New Beginnings.

At the end of March or beginning of April 1998, J.L. learned through Marisa's mother that E.L. had been put up for adoption. He saw Marisa briefly in April 1998. Although she then admitted she had placed E.L. for adoption, she did not provide J.L. with any further details regarding the adoption.

J.L. sought out legal help from various sources. He met with attorneys at two private law firms but did not have sufficient information or money to retain private representation. J.L. ran into Marisa again. She suggested that the Chicago Legal Clinic might be able to help him. At some point in mid-1998, Marisa returned to live with J.L. for a few months. Veronique Baker, an attorney with the Chicago Legal Clinic, testified that J.L. came to the clinic office on June 2, 1998, to keep an appointment Marisa had made for them on May 15, 1998. Persons who call the clinic to make appointments are informed that no case can be taken if there is a domestic violence case pending against the client. During the course of Baker's interview with J.L., Marisa arrived. Baker, realizing that J.L.'s problems were the result of actions taken by Marisa, denied Marisa access to her office because she did not want a conflict of interest to arise. The interview continued, and Baker asked J.L. for certain information regarding the adoption. J.L. went downstairs and outside in an effort to obtain the information from Marisa. During the five minutes J.L. was gone, Baker, through her open second-floor window, could hear J.L. and

Marisa conversing in normal tones outside. When J.L. returned, Marisa had given him the name of the adoption agency (New Beginnings), its address, Larry Raphael's name, and E.L.'s location at the time (Pompano Beach, Florida). Baker then called New Beginnings and spoke with its director, Rita Sankey. Baker then informed J.L. that she had been told by Sankey that E.L.'s adoption had already been finalized. Shortly thereafter, the police arrived and arrested J.L. because Marisa had told them J.L. had assaulted her 5 or 10 minutes earlier. Baker did not believe that any assault had taken place. When J.L. returned to Baker's office several weeks later, Baker explained to him that, pursuant to Legal Clinic policy, she would not be able to provide any representation to him now that an order of protection had been entered against him. According to J.L., the charges against him were later dropped.

Retired attorney William Dillon testified that he was working as a volunteer for the Legal Aid Bureau when he met with J.L. on July 6, 1998. J.L. explained that his wife Marisa had placed their daughter up for adoption without his consent. J.L. returned on July 29 with documents verifying his fatherhood, including a baptismal certificate. On that date, Dillon wrote a letter to New Beginnings and had J.L. sign it. In the letter, J.L. stated that he was E.L.'s biological father, noted that he had been found to be her father in an order of parentage and support, inquired as to any pending adoption action concerning his daughter, stated that he would contest any adoption proceeding, and gave an address and phone number at which he could be served with notice in the event a proceeding were pending or were to take place in the future. The letter was apparently forwarded to Capozzoli, who responded with a letter to Dillon. In the letter, Capozzoli stated that Marisa had informed New Beginnings that J.L. was not E.L.'s father and that J.L. had been reported to the Department of Children and Family Services (DCFS) for molesting E.L. Both of Marisa's statements were false. Capozzoli, in his letter, further advised J.L. to "move on with his life." The letter did not mention the pending adoption proceeding or whom Capozzoli was representing.

In September 1998, Capozzoli did a search of the Illinois putative father registry. Although he used the name of Marisa L., Capozzoli searched using E.'s first name and the last name of the A.s, the potential adoptive parents in Florida, rather than E.L.'s legal last name at the time. The putative father was listed as Perez-Gonzalez. Although J.L. had, on the advice of an attorney, registered with the registry in July 1998, Capozzoli's search failed to find a match. A previous search of the registry, instituted by New Beginnings in May 1998, in which E.L.'s legal name had been used, had also failed to reveal a match.

On October 8, 1998, the final judgment order of adoption was entered. Neither New Beginnings nor Capozzoli had informed the court or E.L.'s guardian *ad litem* of their contacts with J.L. The court, unaware of J.L., stated in its order that no orders had been previously entered in any court affecting the custody, adoption or parental rights of the A.s to E.L.

On November 24, 1998, with the assistance of yet another attorney, J.L. filed a motion to examine and copy the court file from the adoption proceedings. The next day, the A.s first learned that J.L. was claiming to be E.L.'s father. On December 2, 1998, J.L. filed verified petitions pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1998)) to set aside the adoption based on lack of jurisdiction and based on fraud. After a paternity test proved that he was E.L.'s father, J.L. moved for summary judgment on his petitions.

After hearing arguments, the circuit court held Marisa's surrender had been properly procured and that Marisa had a legal right to surrender E.L. to an agency for adoption. The court held that Marisa's false affidavit of identification which identified Perez-Gonzalez as the biological father of E.L. had created a rebuttable presumption of truth as to that assertion. The court found that although the actions of the A.s attorney had been "improper," the actions did not "rise to the type of fraud sufficient to cause the adoption to be voided." The court held, however, that its failure to acquire personal jurisdiction over J.L. required it to vacate the judgment of adoption.

The court vacated only the judgment order of adoption and denied all other relief sought by J.L. in his motion for summary judgment. In so doing, the court let stand the interim custody order in favor of the A.s that had been entered previously pursuant to the initial adoption petition. The court found that, because it had vacated the adoption order, it was bound by section 20 of the Adoption Act to hold a custody hearing regarding E.L.'s best interests. 750 ILCS 50/20 (West 1998) (stating that "[i]n the event a judgment order for adoption is vacated or a petition for adoption is denied, the court shall promptly conduct a hearing as to the temporary and permanent custody of the minor child who is the subject of the proceedings pursuant to Part VI of the Illinois Marriage and Dissolution of Marriage Act"). Because section 20 stated that the petitioners in an adoption proceeding were to be parties to such a hearing, the court ruled that the A.s need not meet the standing requirements for participation in a custody determination set forth in Part VI of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/601 *et seq.* (West 1998)). 750 ILCS 50/20 (West 1998).

The court proceeded to hold a hearing as to E.L.'s temporary and permanent custody. It was acknowledged during the proceedings below that at the point the hearing commenced J.L., as the biological father, had a presumption in his favor and the burden was on the A.s to show why the predominant rights of the biological father should be overcome and custody placed with them.

At the best interests custody hearing, there was voluminous testimony regarding E.L. and the parties in addition to the chronology set forth above.

Robin Ullman, an employee of Sun Coast International Adoptions, a Florida adoption agency, testified that she did a home study investigation of the A.s in 1996 at their request. Such a study is required in the State of Florida in order to be approved as a potential adoptive parent. The A.s were approved in 1996 and received updated approval in 1998 after it became apparent that they might have an opportunity to adopt E.L. Ullman visited the A.s on three occasions in the five months after E.L. came to live with them to observe their interactions and the bonding process. In August 1998, Ullman, based on her three postplacement observations of E.L. and the A.s, recommended that the placement with the A.s continue and that they be approved for final adoption of E.L. Ullman, testifying as an expert in the field of social work, was of the opinion that the bonding and attachment processes between the A.s and E.L. had successfully occurred and that the A.s were providing a very healthy physical and emotional environment for E.L.

Michelle Kerrigan, the owner, operator, and pre-kindergarten teacher at a preschool in Florida testified that E.L. had been enrolled at the school since June 1998. When E.L. was first enrolled, she was withdrawn and appeared to lack social skills. Since that time, Kerrigan has observed E.L. develop into a very outgoing, happy, and well-adjusted child who plays well with others.

Daniel Cain, a friend of the A.s', testified that since arriving at the A.s, E.L. had gone from withdrawn and temperamental to affectionate and playful.

Joseph A., F.A.'s brother, testified that he visited the A.s several weeks after they brought E.L. home and had seen the A.s and E.L. a number of times since. E.L. was very withdrawn the first time he met her but in subsequent visits had become very outgoing, playful, warm, loving, and engaging.

P.A. testified regarding E.L.'s day-to-day life with the A.s. She described how the A.s had incorporated E.L. into their work life so that she only needed to be at daycare in the morning. P.A. first met J.L. when he came to Florida to take a DNA test on January 22, 1999.

F.A. testified that he recalled E.L. as being fairly withdrawn the first few days she was with the A.s. F.A. testified that, when they first arrived back in Florida with E.L., she had recurring fears of being left alone or abandoned and would sometimes strike them and bite them. Over time she had opened up tremendously and had become much more well-behaved. According to F.A., the A.s had always been open with E.L. about the fact that she was adopted. They had told her that she was very special and had two mommies and two daddies.

Ann Rothschild, an expert in the field of social work, testified that she had inspected J.L.'s apartment to determine whether it would be an appropriate home if custody of E.L. was returned to J.L. She found J.L.'s apartment to be an appropriate and adequate home in which to raise a child.

Alvia Rodriguez testified that J.L. was her nephew. She saw J.L., Marisa, and E.L., two or three times a week for the first two years of E.L.'s life. During this time, she observed that J.L. was doing most of the caretaking, such as feeding E.L. and changing her diapers. Marisa made it clear that she did not want to be involved in caring for E.L. During the second year, Rodriguez observed that Marisa was increasingly rejecting E.L. and would use profanity toward her. During the fall of 1997 and into January 1998, Rodriguez watched E.L. each night while J.L. worked. Rodriguez never saw Marisa feed E.L.

Evangelina L., J.L.'s sister, similarly testified that when E.L. was a baby and toddler, J.L. was her primary caretaker and was a caring father. Evangelina also testified that Marisa was depressed, was unkind to E.L., and was largely uninvolved and that E.L. was a happy baby and toddler.

J.L. testified to his extensive involvement with E.L.'s care during the first 2½ years of her life. When E.L. was a newborn, he was the person who would regularly get up at night and feed her, change her diapers and soothe her. J.L. admitted to past occasional use of cocaine and marijuana, but maintained that he had never used drugs around E.L. J.L. testified that if the court determined custody should continue with the A.s, he would be willing to move to Florida to be near E.L. J.L. also testified that in the event he were granted full custody of E.L., he considered the A.s to now be part of his family and he would thus encourage E.L. to have visits with them.

Andrea Corn testified as an expert witness for the A.s. Dr. Corn stated that she had a doctor of psychology degree. Dr. Corn was contacted by P.A. in April 1999. She subsequently met with the A.s and E.L. at her office, at the A.s home, and observed E.L. at school. She testified that her observations had led her to believe that there was "a very warm intimate and a very secure and loving attachment"

between the A.s and E.L. Dr. Corn also testified that the A.s were E.L.'s "psychological parents." Although Dr. Corn had not met either of E.L.'s biological parents, she did not find that to be significant because, based on what she had learned about E.L.'s behavior when she was first with the A.s, Corn believed that she had an understanding of the kind of home life and early caregiving that E.L. probably received. Dr. Corn understood that, when E.L. had come to the A.s, she had a number of fears and anxieties and had not been outwardly happy, playful or talkative. The above description suggested to Dr. Corn that E.L. had grown up without an attuned and emotionally responsive caregiver or caregivers. Dr. Corn was especially troubled that Marisa had apparently told E.L. that a monster resided under E.L.'s bed, resulting in an ongoing fear of her bed and the dark. Based on her observations, Dr. Corn believed that the A.s had established a "very secure, reliable, safe, consistent and loving home life for E.L. and as a result of those conditions have greatly helped to ameliorate many of the behavioral problems that" the A.s initially described to her regarding E.L.'s behavior when she was first placed with them. Dr. Corn testified that, in her professional opinion, if E.L. were removed from the A.s' home, the effect on E.L. would be "catastrophic," "overwhelmingly traumatic," and she would be at great risk for many psychological problems. Therefore, Dr. Corn believed that it was in E.L.'s best interests to remain with the A.s.

On cross-examination, Dr. Corn testified that she did not observe J.L. with E.L. and could not recall whether she had asked the A.s if she could observe J.L. interact with E.L. Dr. Corn acknowledged that because she had not assessed J.L., there was no way she could recommend that custody of E.L. be returned to him. Dr. Corn did not review the reports from Suncoast, the adoption agency that had approved the A.s for adoption. Dr. Corn acknowledged that if E.L.'s first primary attachment had been to J.L. and that attachment had been broken when Marisa took E.L. away, it was possible that E.L. would experience a level of regression that might explain some of E.L.'s problems and behavior upon arriving at the A.s.

Dr. Bennett Leventhal also testified as an expert witness. Dr. Leventhal testified that he was a physician, a professor of psychiatry and pediatrics, and was director of child and adolescent psychiatry at the University of Chicago. Dr. Leventhal was contacted by counsel for J.L. and was asked to do an evaluation of the parties and E.L. He consented under the conditions that he could evaluate on his own terms and that his principal focus would be the child. He testified that he found both J.L. and the A.s to be "terrific people." In forming his opinions in the case, he reviewed records provided by J.L.'s attorney, reviewed

psychological tests regarding J.L., and spent time over the course of a day with J.L., the A.s, and with the adults and E.L. Dr. Leventhal also consulted with colleagues who had also either reviewed the psychological testing or observed the interactions of the parties.

Dr. Leventhal found that there was no question J.L. was a fit and capable parent and that J.L. had the primary attachment, or base original psychological relationship, with E.L. He likened a strong primary attachment to the solid foundation of a house, on which all other relationships in a child's life are built. Dr. Leventhal observed that watching J.L. and E.L. together was to witness the "magic of good parenting." Leventhal believed E.L. needed to maintain her strong attachment to her father in order to develop appropriately. He therefore believed J.L. should be the starting point as the primary parent for E.L. Although he believed it was in E.L.'s best interest that J.L. be her legal guardian, he believed the A.s needed to play a permanent role in E.L.'s life and that the transition from her current living arrangement to whatever the next living arrangement will be had to be done with "an extraordinary amount of care and sensitivity."

Based on his discussions with the A.s and review of the case, Dr. Leventhal believed E.L.'s behavioral problems when she was first in the custody of the A.s were due to "severe separation disorder, disruption of a solid attachment." He characterized the manner in which Marisa and the persons involved in facilitating the adoption had handled E.L.'s transfer as "abusive," "horrible," and "criminal." He further characterized the A.s' management of E.L.'s problems upon arriving with them as "brilliant."

In his review of the evidence and Dr. Corn's testimony, Dr. Leventhal saw no basis for Dr. Corn's conclusion that E.L. would develop a borderline personality disorder if she were separated from the A.s. Dr. Leventhal also believed that Dr. Corn did not have the specific level of expertise needed to make an evaluation in a case of this nature. Dr. Leventhal testified that Dr. Corn's doctor of psychology degree required less rigorous and lengthy training than obtaining a Ph.D. in psychology or becoming a psychiatrist.

On cross-examination, Dr. Leventhal acknowledged that his conclusion that J.L. be the primary parent to E.L. did not mean other scenarios, including having the A.s as E.L.'s primary custodian and J.L. with secondary involvement, were not also acceptable. He continued:

> "What we are talking about here is a very close call. There is no argument about it. That's why you are before the judge. This two-and-a-half years of a stable relationship that clearly is an important relationship *** slides a psychological decision somewhat, but not overwhelmingly, on the side of the primary attachment figure."

In his closing argument, E.L.'s guardian *ad litem* stated it was his conclusion that E.L.'s best interests would be served by a joint parenting agreement that would make J.L. her legal custodian but would permit her to remain in the physical home and custody of the A.s.

Dr. Leventhal, counsel for both parties, and the judge all commented on the extraordinary manner in which the A.s and J.L. had conducted themselves and expressed hope that the friendly relationship between the parties, centered on a love for E.L., would continue to grow. Both the A.s and J.L. testified that they would want all parties to continue to be involved with E.L. through visitation or other means.

After hearing the testimony, the court went through each factor it was required to consider in making a custody determination that is in the best interests of the child pursuant to section 602 of the Act. 750 ILCS 5/602 (West 1998). The court then held that the best interests of E.L. required an award of joint custody. The court awarded legal custody and guardianship to J.L. after finding that "absolutely there has been no evidence to impact his primary right to be the father of this child." The court further directed that physical custody of E.L. was to remain with the A.s and that J.L., after establishing residency in Florida, was to have visitation with E.L.

When the parties next came before the trial court, they had been unable to agree on the parameters of the joint parenting agreement. The court, unwilling to wait any longer, entered a joint parenting order. The order made J.L. E.L.'s legal custodian and directed that E.L. would continue to reside with the A.s. The order directed that, after a period of transition and provided J.L. moved to Florida, E.L. would spend most weekends, various holidays, and eight weeks over the summer visiting with J.L.

J.L. now appeals.

## II. Jurisdiction and Fraud

J.L. filed verified petitions that sought to set aside the adoption for lack of personal jurisdiction, lack of subject matter jurisdiction, and fraud and sought to have custody of E.L. returned to him. J.L. then moved for summary judgment on the petitions. The trial court, after hearing the arguments of the parties, found that Marisa's surrender had been properly procured and that Marisa had a legal right to surrender E.L. to an agency for adoption. The court held that Marisa's false affidavit of identification which identified Perez-Gonzalez as the biological father of E.L. had created a rebuttable presumption of truth as to that assertion. The court found that the failure of the A.s' attorney to inform the court that he had been contacted by J.L. was

"improper" and had "caused a lot of unnecessary time and energy on the part of the Court, the biological parents and certainly [J.L.] in this matter." The court continued, however, by finding that it did "not believe [Capozzoli's failure] gives rise to the kind of fraud that would require this Court to void all of the proceedings in this matter." Although the court did not grant J.L.'s motions for summary judgment, it did find that it had failed to acquire personal jurisdiction over J.L. and was thus required to vacate the judgment of adoption.

J.L. first contends that where the court failed to acquire personal jurisdiction over him prior to entering the judgment order of adoption, the order and proceedings should have been held to be void *ab initio*.

J.L. maintains that he was a necessary and indispensable party to the adoption proceedings in that he was E.L.'s biological father, had never consented to place her for adoption, had never been found to be unfit, had acknowledged his parentage of E.L. in an agreed order of parentage and support entered in the circuit court well before the commencement of proceedings in this case, was married to E.L.'s biological mother, had regularly paid child support, and had openly held himself out to be E.L.'s father. The trial court agreed that the judgment order of adoption could not stand where the court had lacked personal jurisdiction over J.L., but it ruled that the proper course of action was to vacate the order of adoption and proceed to a custody hearing. The question before this court on appeal is whether, after finding it had not acquired personal jurisdiction over J.L., the trial court erred in failing to find the judgment order of adoption and adoption proceedings void *ab initio*. Whether the court erred in failing to so find is a question of law and, as such, is subject to *de novo* review on appeal. *Woods v. Cole*, 181 Ill. 2d 512, 516, 693 N.E.2d 333 (1998).

●1 Personal jurisdiction is the acquisition by a court of the ability to apply its subject matter jurisdiction to an individual. *In re Marriage of Schlam*, 271 Ill. App. 3d 788, 793, 648 N.E.2d 345 (1995). As noted, the trial court here concluded that it lacked personal jurisdiction over J.L. at the time the adoption order was entered. Judgments or orders entered where a court lacks personal jurisdiction over a party are void *ab initio*. See *White v. Ratcliffe*, 285 Ill. App. 3d 758, 763, 674 N.E.2d 906 (1996); *Schlam*, 271 Ill. App. 3d at 793; *DiNardo v. Lamela*, 183 Ill. App. 3d 1098, 1101, 539 N.E.2d 1306 (1989). We find the trial court thus erred by not finding the judgment order and adoption proceedings void *ab initio*.

The A.s maintain that any orders of the court, if required to be set aside, are set aside only to the extent they affect the party over whom the court lacked jurisdiction. In support, they cite to section 20 of the Adoption Act, which provides, in relevant part, that "[i]f, upon attack

by a person or persons over whom the court lacked jurisdiction, or persons claiming under them, an adoption judgment is set aside, it shall be set aside only insofar as it affects such person or persons." 750 ILCS 50/20 (West 1998). Application of this language to the facts present here does not change the result. As stated above, where the trial court lacked personal jurisdiction over J.L., the orders entered in the adoption proceeding, specifically the initial order granting temporary custody of E.L. to the A.s and the judgment order of adoption, were void *ab initio*. Those orders had affected J.L. by depriving him of the custody and care of E.L. without his consent. Therefore, setting aside those orders as they affect J.L. results in an unconditional return of E.L. to his custody.

The fact that J.L. submitted himself to the jurisdiction of the court when he intervened in November 1998 to attack the previous proceedings does not affect the result. Void orders may be attacked at any time or in any court, either directly or collaterally. *R.W. Sawant & Co. v. Allied Programs Corp.*, 111 Ill. 2d 304, 309, 489 N.E.2d 1360 (1986); *In re J.E.*, 228 Ill. App. 3d 315, 317, 591 N.E.2d 933 (1992). A judgment that is void when entered is not retroactively validated where a party enters a subsequent general appearance, but instead remains void. *J.C. Penney Co. v. West*, 114 Ill. App. 3d 644, 646-47, 449 N.E.2d 188 (1983).

J.L. has alleged, in the alternative, that where fraud occurred in the course of the proceedings, the proceedings should have been found void *ab initio*. In support, J.L. recites a series of occurrences he contends constituted fraud in the adoption proceedings. He alleges that the actions of the various persons involved were designed to keep him and the court from knowing about each other and to make the case look like a typical "agency adoption" rather than a "grey market" adoption for cash. J.L. contends that where, as here, such fraud has occurred, it vitiates all that came before it and the trial court thus erred in failing to find the entire proceedings were void *ab initio*.

Initially, we note that the parties disagree about whether or not the court found fraud in the procurement of the judgment. The ruling of the trial court implies that it did find fraud had occurred but did not find it of a type that would justify holding the entire proceeding void. An interpretation of the trial court's ruling as finding fraud, at least as to Capozzoli, is supported by the court's later statements. At a subsequent hearing, the court stated that although it had found "there was fraud in this case," it "did not give rise to the kind of fraud that would necessitate [the court] voiding the adoption." On a different day, the court reiterated once again that it "did not believe the activities of the parties gave rise to the kind of fraud that would require [the court] to void the judgment."

The A.s maintain on appeal that neither they, New Beginnings, nor Capozzoli committed fraud. However, they have already admitted to such fraud in their response to J.L.'s "First Amended Verified Petition to Set Aside Adoption and Return E.L. to Her Father." In paragraph 47 of said petition, J.L. alleged that the judgment of adoption was obtained by fraud in that the A.s, through attorney Capozzoli's knowledge and actions, knew and on information and belief concealed from the court that J.L. claimed to be the father of E.L. and had acknowledged that he was E.L.'s father in an order of support, and, despite such knowledge, had:

"a. Through the actions of their attorney affirmatively prepared and agreed to a purported judgment order which stated that they were aware of '...no orders entered heretofore in any court affecting the custody, adoption, or parental rights of the Petitioner to this minor...' except the orders heretofore entered in the adoption proceeding; and prepared and agreed to those orders despite their knowledge. Additionally said order stated that the initial petition filed in the case was true, despite its containing similar language concerning the existence of any orders affecting the adoption.

b. On information and belief, submitted the 'Response to Person(s) Requesting Search of Illinois Putative Father Registry' naming only Theodore Perez-Gonzales [*sic*] as a putative father, without naming either 'unknown' or '[J.L.]' as a putative father.

c. Failed to bring to the attention of the court or the guardian *ad litem*, [J.L.'s] claim of paternity and a court order affecting paternity, his lack of consent to adoption, and his address and telephone number.

d. Failed to give notice to [J.L.] of this action despite its knowledge of the facts of this case as set forth in this petition.

e. On information and belief, through the actions of their then attorney, affirmatively withheld information relevant to this case from the court."

Paragraph 48 of the same petition made similar allegations of fraud on the part of New Beginnings. In their response to J.L.'s petition, the A.s admitted the allegations contained in both paragraphs.

■ Finally, we note that the knowledge of an attorney is treated as knowledge of, or knowledge imputed to, the client, whether or not the attorney has actually communicated such knowledge to the client. See *Yugoslav-American Cultural Center, Inc. v. Parkway Bank & Trust Co.*, 289 Ill. App. 3d 728, 737, 682 N.E.2d 401 (1997). Therefore, the complicity, or lack thereof, by the A.s in the fraudulent actions of their attorney is of no significance under the law.

■ We find the trial court erred in failing to find the judgment order of adoption void *ab initio* on the basis of fraud. Fraud, for purposes

of the Adoption Act, is defined as " 'anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture.' " *Regenold v. Baby Fold, Inc.*, 68 Ill. 2d 419, 435, 369 N.E.2d 858 (1977), quoting *People ex rel. Chicago Bar Ass'n v. Gilmore*, 345 Ill. 28, 46, 177 N.E. 710 (1931). Where such fraud is proved, it vitiates all transactions touched by it. *Gilmore*, 345 Ill. at 46.

Here, the record indicates that both the trial court and J.L. were victims of fraud throughout the proceedings. The fraudulent conduct included fraud perpetrated by the A.s' attorney.

Although presented to the court as an agency adoption, the record indicates this was an agency adoption in name only. Although New Beginnings is apparently a licensed agency, its lack of involvement and apparent deference to Raphael, who had once served as the agency's president, is troubling to this court. E.L. was handed over to the A.s with only the clothes on her back. There were no toys or other familiar objects. The A.s paid a total of $21,650 during the course of the adoption, including $5,000 in cash to attorney Capozzoli. Besides the cash, the remainder was paid by check to either disbarred attorney Raphael or to an entity called "Adoption Consulting Services," an organization unfamiliar to the A.s at the time they made out the $12,650 check. The checks, including the one made out to Adoption Consulting Services, ended up in a bank account controlled by Raphael. There is no evidence that New Beginnings, the purported adoption agency, ever received any money, despite the fact that Rita Sankey, the agency's director, filed an affidavit of agency with the court on the day the adoption took place, stating that a total of $17,000 in fees had been received by or promised to the agency. The A.s, too, submitted an affidavit to the court stating that the majority of the fees paid had been paid to New Beginnings Adoption Agency. Attorney Capozzoli certified on that same document that he had read the parents' affidavit and that it was true and correct to the best of his knowledge, information, and belief. We note that it is illegal under both the Adoption Act (750 ILCS 50/21 (West 1998)) and the Adoption Compensation Prohibition Act (720 ILCS 525/1 (West 1998)) for any person, agency, or other entity, other than a child welfare agency, to receive or accept any compensation for placing out a child for adoption.

In addition, the record indicates that misrepresentations were made or communicated to J.L. in what amounted to a successful effort to keep him from learning of the adoption proceedings until after a final order had been entered. Further, fraud was perpetrated on the

trial court by the failure of Capozzoli to bring his knowledge of J.L.'s claim of fatherhood to the attention of the court.

In June 1998, legal aid attorney Veronique Baker called New Beginnings on behalf of J.L. to inquire as to any adoption proceeding involving E.L. After speaking with Rita Sankey, Baker informed J.L. that she had been told the adoption had already been finalized.[1] In actuality, the final order of adoption was not entered until October 1998, some four months later.

In July 1998, several months before the adoption was finalized, J.L., with the help of legal aid attorney Bill Dillon, sent a letter to New Beginnings in which he stated that he was E.L.'s biological father, was identified as such on her baptismal certificate, and had been found to be her father in an order of parentage and support. J.L., in the letter, inquired as to any pending adoption action concerning his daughter, stated that he would not consent to the placement of E.L. for adoption and would contest any adoption proceeding, and gave an address and phone number at which he could be served with notice in the event a proceeding were pending or were to take place. This letter was forwarded to Capozzoli who, in a written response, disputed J.L.'s claim of fatherhood and suggested that J.L. "move on with his life." Notably, the letter did not mention that an adoption proceeding was pending or whom Capozzoli was representing. Although the final order of adoption was not entered until more than three months later, Capozzoli failed to ever bring J.L. or the letter to the attention of either the court or E.L.'s guardian *ad litem*. The court, unaware of J.L., ultimately signed a final judgment order for adoption which stated that "[n]o orders have been entered heretofore in any court affecting the custody, adoption or parental rights of the Petitioner to this minor, except the Orders heretofore entered in this proceeding." Capozzoli's silence, under the circumstances, constituted a fraud upon the court. See *In re Nadler*, 91 Ill. 2d 326, 330, 438 N.E.2d 198 (1982) (holding that an attorney's silence while adopting couples falsely swore before

---

[1]The A.s maintain on appeal that Baker's testimony regarding what Sankey said was inadmissible hearsay and was objected to and excluded as such. We find that it was neither excluded nor inadmissible. Although the testimony was objected to and ruled inadmissible when counsel for J.L. first attempted to elicit it, the testimony relied upon by J.L. on appeal was elicited through the guardian *ad litem's* cross-examination of Baker and was not objected to. Further, the testimony was not offered for the truth of Sankey's statement that the adoption had already been finalized. The testimony was instead part of an effort to show that there was a pattern of conduct on the part of New Beginnings and Capozzoli that was calculated to keep J.L. from learning about the adoption proceedings.

the court to the accuracy of affidavits regarding expenses incurred in the adoptions constituted a fraud on the court).

In September 1998, one month prior to the entry of the final judgment order of adoption, Capozzoli conducted a search of Illinois' putative father registry. Although J.L. had registered in July, no match was found. This may be largely attributed to the fact that, rather than searching using E.L.'s legal name at the time, Capozzoli's search listed E.L. as having the last name of the A.s, the adoptive parents, despite the fact that the adoption had not been finalized.

"A void judgment or order is one that is entered by a court lacking jurisdiction over the parties or the subject matter, or lacking the inherent power to enter the particular order or judgment, or where the order was procured by fraud." *Miller v. Balfour*, 303 Ill. App. 3d 209, 215, 707 N.E.2d 759 (1999). Not all judgments obtained by fraud are void. *In re M.B.*, 235 Ill. App. 3d 352, 377-78, 601 N.E.2d 1152 (1992); *In re Marriage of Noble*, 192 Ill. App. 3d 501, 509, 548 N.E.2d 518 (1989). Courts distinguish between fraud that prevents a court from acquiring jurisdiction or merely gives the court colorable jurisdiction, and fraud occurring after the court's valid acquisition of jurisdiction, such as false testimony or concealment. *Massie v. Minor*, 307 Ill. App. 3d 115, 119, 716 N.E.2d 857 (1999); *M.B.*, 235 Ill. App. 3d at 377-78; *Falcon v. Faulkner*, 209 Ill. App. 3d 1, 13, 567 N.E.2d 686 (1991); *Noble*, 192 Ill. App. 3d at 509. Only judgments procured by the former type of fraud are void. *M.B.*, 235 Ill. App. 3d at 377-78; *Falcon*, 209 Ill. App. 3d at 13; *Noble*, 192 Ill. App. 3d at 509. This type of fraud is sometimes referred to as "extrinsic fraud," which is defined as fraud that occurs in situations where an unsuccessful party has been prevented from fully exhibiting his case by being kept away from the court or is kept from gaining knowledge of the suit. See *Massie*, 307 Ill. App. 3d at 119; *Falcon*, 209 Ill. App. 3d at 13.[2]

The record in this case contains clear and convincing evidence of fraud committed on the court and on J.L. The court's determination that the fraud present in this case was not the type of fraud that would render the judgment and proceedings void *ab initio* is a conclusion of law and is thus subject to *de novo* review. See *Woods*, 181 Ill. 2d at 516. We find that the fraud here had the purpose and effect of preventing the court from acquiring personal jurisdiction over J.L.

As we have previously discussed, the trial court did not acquire

---

[2]Although in Illinois the term "extrinsic fraud" is most often discussed in cases dealing with collateral attacks on foreign judgments, we find the definition useful and applicable in the context of the unique facts before the court in this case.

personal jurisdiction over J.L. prior to the entry of the judgment order of adoption. The fraudulent course of conduct here successfully prevented the trial court from obtaining jurisdiction over J.L., the unconsenting biological father of E.L. and thus a necessary party. The court found that it lacked personal jurisdiction over J.L. and concluded that it was therefore required to vacate the order of adoption. The court did not, however, find that it had failed to acquire such jurisdiction due to fraud. The court erred in failing to so find.

It was not until after the judgment order of adoption had been entered that J.L. came to the attention of the trial court. At that point, J.L. presented clear and convincing evidence establishing that the fraud perpetrated upon the court and upon J.L. had prevented the court from obtaining personal jurisdiction over J.L. The proper course of action, based on evidence of pervasive fraud of a type that prevented the court from acquiring personal jurisdiction over the biological father, should have been to find any previous orders entered in the proceedings void *ab initio*. The trial court thus erred in finding that the fraud was not the "type" of fraud that would require it to declare the judgment and proceedings void *ab initio*.

In addition, we find that public policy requires the judgment order of adoption be held void. To hold otherwise would merely encourage fraud in future adoption proceedings. Section 20 of the Adoption Act requires a custody hearing to be held where a judgment of adoption has been vacated. 750 ILCS 50/20 (West 1998). The trial court here held that, under section 20, the petitioners to an adoption proceeding automatically have standing to take part in such a hearing. Here, there was a successful effort to keep the trial court and J.L. apart long enough to secure a final order of adoption. Where such fraud results in a mere vacation of the order, parties who become aware of a nonconsenting parent may be encouraged to deceive a court in order to have a final order of adoption entered, secure in the knowledge that at that point they will be able to take part in a custody hearing regarding the best interest of the child. At the same time, as here, the continued deception allows potential adoptive parents additional time to further bond with a child. In practical terms, the longer a party has custody of a child before a best interests hearing occurs, the greater the chance that the best interests of the child will lie with the child remaining in their care. Without the pattern of deceit apparent in this case, there would have been no judgment of adoption to vacate because J.L. would not have consented.[3] It was the ongoing fraud on the court and against J.L. that allowed the adoption order to be successfully entered and

---

[3]We note the trial court ultimately found J.L. to be a fit parent pursuant

ultimately allowed the A.s to retain custody of E.L. until the best interests hearing under section 20 could take place. The A.s were clearly the beneficiaries, unwittingly or not, of any fraud that occurred. To allow them to now profit from such fraud would only encourage similar fraudulent behavior in the future and would clearly be contrary to public policy. See *Miller v. Gupta*, 275 Ill. App. 3d 539, 544, 656 N.E.2d 461 (1995) (noting that equity and fairness will not allow a party to profit from their own wrongdoing), *aff'd in part & rev'd in part*, 174 Ill. 2d 120, 672 N.E.2d 1229 (1996).

The A.s contend that the allegedly fraudulent conduct would have had much less of an impact had J.L. exercised "more diligence" in attempting to assert his rights. The record does not reflect a lack of diligence on the part of J.L. in attempting to find E.L. and assert his rights as her biological father. Although he was thwarted on a number of occasions, at times by Marisa, at times by his own lack of legal knowledge and adequate funds to retain representation, and at times by New Beginnings and the A.s' attorney, the evidence indicates that he engaged in a diligent course of conduct designed to protect his rights as E.L.'s father. J.L.'s conduct did not in any way contribute to a fraud being perpetrated.

In conclusion, we find that the trial court erred in failing to declare the judgment order and proceedings void *ab initio* due to a lack of personal jurisdiction over J.L. and fraud in the procurement of the judgment. Had the court properly ruled that the proceedings were void *ab initio*, custody of E.L. would have been immediately returned to J.L. and the proceedings would have been at an end.

### III. Orders of Joint Custody and Joint Parenting

Our findings of error above are dispositive of this case and we need not, therefore, address the additional issues raised by the parties. However, in an effort to bring closure to this litigation, and in light of the uncertainty surrounding under what circumstances recent amendments to section 20 of the Adoption Act would apply, we will address the parties arguments regarding the trial court's orders of joint custody and joint parenting.

Following our supreme court's decision in *In re Petition of Doe*, 159 Ill. 2d 347, 638 N.E.2d 181 (1994), the legislature amended section 20 of the Adoption Act to require that, in the event a judgment order for adoption is vacated or a petition for adoption denied, a custody hearing be conducted pursuant to Part VI of the Act. 750 ILCS 50/20 (West 1998); 750 ILCS 5/601 *et seq.* (West 1998). In our opinion, the

---

to the Adoption Act. Thus, a petition premised on J.L.'s alleged unfitness would have failed.

plain language of section 20 does not require a custody hearing to be conducted where, as here, the judgment order for adoption and proceedings have been held to be void *ab initio*. Nor do we believe the intent of the legislature in amending section 20 was to require a custody hearing where an adoption order and proceedings have been held void *ab initio* due to lack of jurisdiction and fraud.

Assuming, *arguendo*, that section 20, as amended, required a custody hearing to be held in this case, we find the trial court's order granting physical custody of E.L. to the A.s was against the manifest weight of the evidence and the joint parenting order entered by the court was an abuse of discretion.

Both J.L. and *amici curiae* the Loyola Childlaw Center and Northwestern Children and Family Justice Center contend that the trial court's "best interests" custody determination was not in accordance with Illinois law. A trial court's determination of child custody will not be disturbed on appeal unless the custody award is contrary to the manifest weight of the evidence or unless the court has abused its discretion. *In re Lutgen*, 177 Ill. App. 3d 954, 971, 532 N.E.2d 976 (1988).

"The right and correlative responsibility of a parent to care for his or her child is fundamental and as ancient as mankind." *In re Custody of Townsend*, 86 Ill. 2d 502, 509, 427 N.E.2d 1231 (1981). The primacy of a natural parent's fundamental right in the care, custody and control of his or her own children has been consistently recognized at both the federal and state level, most recently by the United States Supreme Court in *Troxel v. Granville*, 68 U.S.L.W. 4458, 4460 (June 5, 2000), in which the court, in a plurality opinion, noted that in light of extensive precedent, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." See also *Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558, 92 S. Ct. 1208, 1212 (1972) (noting that the interest of a parent in the care, custody, and management of his or her children "undeniably warrants deference and, absent a powerful countervailing interest, protection"); *In re Petition of Kirchner*, 164 Ill. 2d 468, 490, 649 N.E.2d 324 (1995) ("The superior right of the natural parents to the care, custody and control of their child is the law of the land and is also embodied in Illinois statutory law"). In child custody disputes, this fundamental right is expressed through the well-established presumption that the right or interest of a natural parent in the care, custody, and control of his or her child is superior to the right or interest claimed by a third person. *Townsend*, 86 Ill. 2d at 508. This presumption is not, however, absolute, but instead serves as

one of several factors used by courts in deciding where the best interests of the child lie. *Montgomery v. Roudez*, 156 Ill. App. 3d 262, 266, 509 N.E.2d 499 (1987). In order to retain custody of a child over the superior right of a natural parent, a third party must demonstrate good cause or reason to overcome the presumption that a parent has a superior right to custody and must show that it is in the child's best interests that the third party be awarded care, custody, and control of the child. *Townsend*, 86 Ill. 2d at 510-11.

■ If, as the trial court ruled here, section 20 applies in cases such as the one before this court, it creates a possibility that the best interests of a child might lie with the petitioning adoptive parents or some other third party, even where a biological parent or parents have not consented or been found to be unfit. Assuming the amendment creates such a possibility, we do not view it as impacting on or eliminating the presumption that, in a child-custody dispute, the right or interest of a natural parent in the care, custody, and control of a child is superior to a claim by a third party. The "superior rights doctrine" thus applies to a best interests hearing held under section 20. Indeed, both the trial court and parties acknowledged the doctrine and its application to the hearing on a number of occasions. The parties did not start the custody hearing on equal footing, as the burden in this case was on the A.s to establish good cause or reason to overcome the presumption that J.L., E.L.'s natural father, had the primary and superior right to custody of his daughter. We find that the trial court did not give appropriate consideration to the presumption in making its ruling.

At the conclusion of the best interests hearing, the court found that "there has been absolutely no evidence to impact [J.L.'s] primary right to be the father of this child." J.L. was further found fit by the court to be E.L.'s legal guardian and custodian. These findings alone indicate that there was no finding of good cause or reason to overcome the presumption that J.L. had a superior right to the custody of his daughter.

The trial court also made oral findings pursuant to section 602 of the Act, which sets forth the various factors a court is required to consider in making a best interests determination. 750 ILCS 5/602 (West 1998). The court, on almost every factor, had nothing but praise for both parties.

When addressing "the wishes of the child's parent," the court commented that J.L. "has been ever vigilant in articulating his rights and his desire to have his daughter returned to him." The court further found that the record was "replete" with the efforts J.L. had made to establish that E.L. was his daughter and to establish that he desired to maintain a parental relationship with her.

As to the wishes of E.L., the court noted that she was too young to make such a decision but that it found her relationships with both parties to be positive ones. The court continued by making comments about its own observations of J.L. According to the court, it found J.L.'s testimony to be credible and found him "to be extremely open and forthcoming with issues that confronted his life, his problems, what his circumstances have been, and how he has attempted to ameliorate those." The court further believed that J.L.'s "overriding and overwhelming concern for his child would dictate the quality of his behavior and his relationship."

The court then addressed factor number three: "the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest." Here, the court commented on the sincerity and "very open and forthcoming nature" of the A.s. The court noted the A.s' love for E.L., attachment to her, their strong desire to be parents to her and to provide an appropriate home for her. The court was impressed by their willingness, after meeting J.L., to allow J.L. access to their home and E.L. The court concluded, "[t]he kind of home that [the A.s' have] provided for [E.L.], the information about her school, the information about the activities that they include her in, the way they have integrated her in their work situation indicates that they have significantly impacted this child's life, and their interest in this child is very well established."

The court next looked at E.L.'s adjustment to her home, school and community. The court commented favorably on J.L.'s involvement with E.L. during her early years and the involvement with J.L.'s sister and mother in E.L.'s care. The court also commented favorably on the A.s having involved E.L. with their extended family, noting the "familiar pattern" of interactions they had created for E.L. with those relatives.

The court, in next addressing the mental and physical health of all individuals involved, found that both parties had "very strong mental and physically positive examples to offer this child."

The court next looked at the final statutory factor[4]: the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the other party. The court noted that both parties had indicated they were willing to do whatever was ultimately determined to be in the best interests of E.L.

---

[4]The court noted that the statutory factors concerning physical violence by a custodian and the occurrence of ongoing abuse had no relevance to the proceeding at hand.

The court then proceeded to address the testimony of Drs. Corn and Leventhal. The court, in so doing, stated:

> "The experts on behalf of the [A.s] indicated that they believe that the separation anxiety that would occur if [E.L.] was removed from the [A.s'] home would have a lasting impact. Dr. Leventhal agreed that it would have some impact, but said that because of her age and the circumstances, we could not predict, it would be impossible to predict the kind of behaviors that Dr. Corn said would occur if the separation occurred, but he indicated that there would be some separation anxiety and some problems with separations.
>
> Dr. Leventhal indicated that he believed that a primary relationship, bonding relationship had been established between [E.L. and J.L.] which has set the foundation. He described it as a house, building the foundation for her health and allowing her to make other relationships and to grow and thrive in her current relationships and her current situation with the [A.s].
>
> Dr. Leventhal indicated that based upon his assessments and his reviews of all the parties, he thought that under those circumstances that his recommendation was the opposite of Dr. Corn's. He believed that [E.L.] should be returned to the custody of [J.L.] with significant involvement by the [A.s]. Dr. Corn believed that [E.L.] should stay with the [A.s] with significant involvement by [J.L.].
>
> Dr. Leventhal when pressed—well, not pressed—but when asked the question even though that was his recommendation what would be the impact on [E.L.] if she stayed with the [A.s] on the one hand and what would be the impact if she stayed with [J.L.] on the other hand. He had indicated that he thought it was best for [E.L.] to stay with [J.L.] based upon his primary bond that he saw, but he also said, and the Court found this interesting, that under any scenario [E.L.] would be able to thrive and would be able to survive and be able to move forward."

Finally, the court noted its concern that E.L., being a child of Hispanic background, establish her Hispanic roots and learn about her culture. The court concluded, in this regard, that E.L. would be able to reestablish those roots even if she remained in the A.s' custody.

We believe that the trial court's findings, as reflected in its oral statements, indicate that it found J.L. and the A.s to be on approximately equal footing in terms of fitness and E.L.'s best interests. The parties, however, due to the superior rights doctrine, did not enter the custody hearing on equal footing. Because the law presumes that it is in the best interests of a child to be raised by the natural parent, the right of a natural parent will ordinarily prevail where the parties are found to be equally fit. *In re Custody of Krause*, 111 Ill. App. 3d

604, 609, 444 N.E.2d 644 (1982). The A.s have made an invaluable contribution to E.L.'s life and well-being following her traumatic separation from J.L., her primary caretaker during the first 2½ years of her life. All other things being equal, however, the presumption that E.L.'s best interests lie with being in the custody of her natural father was not overcome here. We therefore find that the trial court's award of joint custody was against the manifest weight of the evidence and that both legal and physical custody of E.L. should be in the biological father, J.L.

We also find that the joint parenting order entered by the trial court represented an abuse of discretion. Although the court gave legal custody and guardianship of E.L. to J.L., the joint parenting order entered by the court made that grant largely illusory. To obtain the visitation rights outlined in the order, J.L., a lifelong resident of Chicago, was required to relocate to Florida. The order provided that if J.L. did not relocate to Florida, he could only visit E.L. by coming to Florida. As we read the order, if he chose not to relocate, J.L. would still have been required to work his way through a rigorous set of supervised visitations over a number of weeks in order to obtain unsupervised visitation, thereby making it impracticable to continue to reside in Illinois should he desire any sort of regular or unsupervised visitation with his daughter. Although J.L. expressed a willingness to relocate during the course of the proceedings, we find that such a requirement, as set forth in the order, was not in keeping with the findings of the court either as to J.L.'s fitness as a parent, the superior rights doctrine (as outlined above), or with the grant of legal custody and guardianship made by the court. To his credit, it was acknowledged at oral arguments on this case that J.L. had moved to Florida and was engaging in regular visitation with E.L. Even with that being the case, the grant of legal guardianship and custody, and its accompanying decision-making power, cannot be effectively implicated where E.L.'s primary residence remains with the A.s. See *In re Marriage of Ivey*, 261 Ill. App. 3d 200, 207, 632 N.E.2d 1121 (1994) ("A trial court may not create custody merely by calling it so").

## IV. Conclusion

We find the trial court erred in failing to find the judgment order of adoption and accompanying proceedings void *ab initio* where the court lacked personal jurisdiction over J.L. and where fraud committed on the court and J.L. kept the court from acquiring personal jurisdiction over J.L. We further find that the trial court's order granting physical custody of E.L. to the A.s was against the manifest weight of the evidence and that the court's joint parenting order was an abuse

162

of discretion. The trial court's order vacating the judgment order of adoption and continuing the case for custody proceedings pursuant to section 20 of the Adoption Act is therefore reversed. The court's order of joint custody and its joint parenting order are vacated.

The circumstances that have led us to this point are unfortunate indeed. This court is not unmindful of the delicate nature of this case and the impact our decision will have on all of the parties' lives, and, most significantly, the impact it will have on the life of E.L. It is thus imperative that a transition plan be ordered that creates, as best as can be done under the circumstances, a smooth transition of sole physical custody to J.L. In conclusion, we remand this cause to the trial court with directions to enter an order granting legal and sole physical custody of E.L. to her biological father, J.L. In so doing, we also give the trial court the limited authority to create an accompanying transition schedule that expeditiously, and with the best interests of the child in mind, effectuates the order of custody.

Reversed in part; vacated in part and remanded with directions.

COUSINS, P.J., and GORDON, J., concur.